UNITED STATES of America, Appellee,

v.

Emrolyn Kae WHITETAIL, Appellant.

No. 91–1400.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 15, 1991.

Decided Feb. 12, 1992.

Donald R. Becker, Fargo, N.D., for appellant.

Dennis D. Fisher, Fargo, N.D., argued (Stephen D. Easton, on the brief), for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

This is a direct appeal of a criminal conviction and sentence. Emrolyn Kae Whitetail was indicted for the second degree murder of Robert McKay, her long-time, live-in boyfriend, in violation of 18 U.S.C. § 1111 (1988). During her trial she never denied that she killed McKay, but rather contended that, at the time of the killing, she was suffering from battered-woman syndrome, that McKay was beating her or was about to begin beating her, and that she stabbed him in self-defense. The jury rejected her claim of self-defense and found her guilty. She was sentenced to 108 months in prison to be followed by three years of supervised release.

On appeal[1] she contends that her conviction should be reversed because the Dis-

---

1. Jurisdiction is proper under 18 U.S.C. §§ 1153, 3742(a)(1), (2) (1988), and 28 U.S.C. § 1291 (1988).

trict Court admitted into evidence testimony of her prior bad acts and her reputation for violence. She also contends that the District Court erroneously believed that it could not consider her battered-woman defense as a basis for departure from the sentencing range prescribed by the sentencing guidelines. We affirm her conviction, vacate her sentence, and remand for resentencing.

## I.

At approximately 6:00 a.m. on September 5, 1990, Emrolyn Whitetail stabbed Robert McKay with a butcher knife in the lower right side of his back. The stabbing occurred in the couple's home on the Devil's Lake Indian Reservation at Fort Totten, North Dakota, after the two had been drinking all night. After the police arrived, Whitetail told them that she and McKay had been fighting and that she had stabbed him because she was afraid he was going to beat her up. She also directed them to the location of the butcher knife. Shortly after being taken to the hospital, McKay died from the loss of blood resulting from his wounds. The physician to whom McKay was taken testified that it appeared that, after McKay was stabbed, the knife was removed partially and then thrust back into his body. There were no eyewitnesses to the stabbing or the events of the night preceding it.

At trial, to support her claim that she suffered from battered-woman syndrome, Whitetail produced several witnesses who testified that she had seemed afraid of McKay, that they had seen her with bruises, black eyes, and similar injuries, and that they had seen McKay physically abusing her. Her mother, Dorothy Whitetail, testified that she had seen McKay pulling her daughter's hair and that she had seen bruises on her daughter's face. Whitetail's sisters, Rose Whitetail, Claudette Williams, and Donna Whitetail, testified that on many occasions they had seen their sister with black eyes and bruises. In addition, Rose Whitetail testified that she once had witnessed McKay beating Emrolyn with a boot, and that on another occasion she had seen cuts on Emrolyn's head that appeared to have been made with the claw end of a hammer. Claudette Williams testified that she had witnessed a physical altercation between McKay and Emrolyn, although she did not know who initiated it, and that on another occasion she had seen Emrolyn with a broken nose. Donna Whitetail testified that Emrolyn had appeared to be afraid of McKay.

In addition, Emrolyn Whitetail produced two expert witnesses who testified with regard to battered-woman syndrome. According to these experts, this syndrome is brought about by subjecting a woman to continuous, severe, long-term abuse. A woman who experiences battered-woman syndrome, according to these experts, would feel trapped, desperate, isolated, ashamed, and hopeless, would have a low self-esteem, and would tend to be submissive and passive. Both experts concluded that Whitetail was suffering from the syndrome at the time she killed McKay.

Whitetail took the stand and testified with regard to a number of specific incidents in which McKay allegedly physically abused her.[2] She also testified that McKay had beaten her regularly and that he had done so on more occasions than she could count, and that she was afraid of him.

The government attacked Whitetail's defense during its cross-examination of Whitetail and her witnesses. For example, during the cross-examination of Donna Whitetail, the government managed to elicit testimony, over objection, that Emrolyn had been in a fight with Donna, had knocked the phone from Donna's hand, and had prevented Donna from calling their mother. Susan Patterson, one of Whitetail's expert witnesses, testified on cross-examination that a woman who was the

---

2. Specifically, she testified that McKay had: beaten her when she and McKay lived at her mother's house; beaten her when she and McKay lived at his mother's house; beaten her when he was drunk; hit her on the head with the claw end of a hammer; inflicted the bruises seen by Dorothy Whitetail; beaten her with a boot; threatened to set fire to her and her children; choked her; split her lip; and broken her nose.

aggressor in fights with her husband would not qualify as a battered woman. She also testified, over objection, that she was unaware Whitetail had threatened McKay with a knife less than a month before his death, and she admitted that such knowledge would be relevant in making a determination of whether Whitetail was suffering from battered-woman syndrome. Dr. Zimmerman, Whitetail's other expert witness, testified that he had based his conclusion that Whitetail was a battered woman upon medical records that included records of injuries she had received at the hands of her brother and sister. He also testified, over objection, that he was aware of a fight between Whitetail and McKay a few days before the killing in which Whitetail had threatened McKay with a knife. Finally, he testified over objection that it would be inconsistent for Whitetail to have been the aggressor in that knife incident if she was suffering from battered-woman syndrome.

The government also elicited unfavorable testimony from Emrolyn Whitetail as is evident in the following excerpt from her cross-examination:

Q. You like to fight, don't you?

A. Yes.

Q. In fact, you fight with your brothers and sisters, don't you?

A. Yes.

Q. In fact, you start some of those fights, don't you?

A. Well, they push their limit where I have to defend myself with them.

Q. And you defend yourself with a knife usually?

A. No, I don't. Not with them.

Q. How many fights do you think you have had over the last seven and a half years with people other than Robert McKay?

A. Quite a few.

Q. Would you say three a week?

A. No.

Q. You drink about three times a week, don't you?

A. Yes.

Q. You get mean when you drink, don't you?

A. Not all the time.

Q. But you have a reputation for being mean when you're drunk, isn't that right?

A. Yes. But not toward Robert.

Q. But you don't take anything from anybody when you're drinking, isn't that right?

A. Other people, yeah, they say things about me, then I—

Q. That gets you mad, doesn't it, when they say things about you?

A. Yes, they do.

. . . .

Q. But it's not unusual for you to get into a fight if somebody says something about you and you take care of the situation, isn't that right?

A. Yes.

Transcript at 600–01, 604 (Testimony of Emrolyn Whitetail). This testimony was elicited without objection. Whitetail also testified on cross-examination that: her nose had been broken five times; her nose had been broken by people other than McKay; another man, with whom she had had a brief relationship, had broken her jaw; she had fought with her sister Donna Whitetail; she had fought with her sister Claudette Williams; she had kicked Brenda Whitetail in the eye because Emrolyn had caught her with McKay; she had punched a social worker in the mouth; and she had pushed McKay down when he was drunk causing him to hit his head on a coffee table. This testimony also was elicited without objection.

In addition, the government called several rebuttal witnesses. Sheila Thompson, the first rebuttal witness, testified that less than a week prior to McKay's death she had witnessed a fight between Whitetail and McKay in which Whitetail had obtained a knife from the kitchen and had threatened McKay with it. Thompson testified that she had intervened and had asked Whitetail for the knife and that Whitetail had responded by dropping the knife. Kercia McKay, McKay's niece, testified that approximately a week prior to McKay's death

she witnessed a fight between Whitetail and McKay in which Whitetail retrieved a knife from the kitchen and returned to the fight with McKay, from which McKay emerged with a cut on his head. Deana McKay, McKay's sister, testified that Whitetail once had struck her. She also testified that she had witnessed the knife-wielding incident about which Sheila Thompson had testified and that Whitetail had a hot temper and was not afraid of anyone. Transcript at 658 (Testimony of Deana McKay). Julie Fasching, a social worker, testified that on one occasion Whitetail had attacked her, striking her once in the mouth before being subdued. She also testified that the opinion in the community was that Whitetail "was chemically dependent, had a reputation for violence and it could be directed at people when she was under the influence...." Transcript at 695–96 (Testimony of Julie Fasching). Whitetail concedes that she objected to none of this testimony.

## II.

■ Whitetail argues that the District Court committed reversible error by admitting into evidence testimony regarding her prior bad acts and her reputation for violence, which she contends was inadmissible under Rule 404 of the Federal Rules of Evidence. We disagree. At trial Whitetail made only five objections, arguably based upon Rule 404, with respect to all the testimony she now challenges. Thus, to the extent that her appeal is based upon the admission of evidence to which she never objected at trial, our standard of review is plain error.[3] *See United States v. Roenigk*, 810 F.2d 809, 815 (8th Cir.1987). Under this standard, we will not reverse Whitetail's conviction unless admission of the challenged testimony "undermine[d] the fundamental fairness of the trial and contribute[d] to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16, 105

S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). To the extent that Whitetail is appealing from the District Court's admission of testimony over her objection, we review for abuse of discretion. *United States v. Weddell*, 890 F.2d 106, 107 (8th Cir.1989) ("The admissibility of evidence lies within the sound discretion of the trial judge, and rulings on the admission of evidence will not be disturbed on appeal absent an abuse of that discretion."). We find neither abuse of discretion nor plain error.

■ On direct examination Donna Whitetail testified that she had seen Emrolyn with bruises and black eyes during the period that Emrolyn and McKay lived together. She did not testify as to who had caused these injuries. On cross-examination, the government asked her whether she knew that Emrolyn had been in fights with people other than McKay. She also was asked whether Emrolyn had been in a fight with her in which Emrolyn had knocked a telephone from her hand. Emrolyn objected to both questions. The District Court overruled these objections on the ground that the questions were relevant to the issue of how Emrolyn had sustained the injuries about which Donna had testified on direct. As Donna's testimony on direct examination about having seen Emrolyn with bruises and black eyes tended to suggest that McKay had inflicted these injuries, we have no difficulty in concluding that the District Court's decision to permit cross-examination regarding possible other causes of Emrolyn's injuries was not an abuse of discretion.

■ Whitetail also objected once during the cross-examination of Susan Patterson and twice during the cross-examination of Dr. Zimmerman, her two expert witnesses. She argues that the District Court should have sustained these objections. On all three occasions, however, her objections were directed at questions that addressed

---

**3.** Whitetail was granted a motion in limine that precluded the government from introducing "direct evidence," Transcript at 8, concerning Whitetail's character, but leaving open the possibility that such evidence would be admissible in rebuttal. Id. at 8–9. Moreover, " '[an] objection [still] is required to preserve error when an opponent, or the court itself, violates a motion in limine that was granted.' " *United States v. Roenigk*, 810 F.2d 809, 815 (8th Cir.1987) (first brackets in original) (quoting *Collins v. Wayne Corp.*, 621 F.2d 777, 785 (5th Cir.1980)).

the underlying facts or data upon which her experts had based their opinions. Such inquiries clearly are permissible under the Federal Rules of Evidence. *See* Fed. R.Evid. 705 ("The expert may in any event be required to disclose the underlying facts or data on cross-examination."); *see also* Fed.R.Evid. 703 ("If of a type reasonably relied upon by experts in the particular field ... the facts or data need not be admissible in evidence."). Admission of this testimony was not an abuse of discretion.

■ The remainder of the testimony Whitetail now challenges was admitted without objection at trial and therefore is reviewed only for plain error. The majority of this testimony was directed toward prior incidents in which Whitetail might have received the bruises, black eyes, and other injuries about which her witnesses testified during her case-in-chief. The admission of such testimony was not error of any kind and certainly not plain error, as indicated above.

■ Another portion of this testimony concerned the two incidents, occurring about one week prior to McKay's death, in which Emrolyn Whitetail was seen wielding a knife in fights with McKay. Accepting for the sake of argument Whitetail's characterization of this testimony as evidence of prior bad acts, we have held that evidence of prior bad acts is admissible under Rule 404(b) of the Federal Rules of Evidence:

> if it is (1) relevant to a material issue; (2) of crimes similar in kind and reasonably close in time to the crime charged; (3) sufficient to support a jury finding that the defendant committed the other crime; and (4) more probative than prejudicial.

*United States v. Dobynes,* 905 F.2d 1192, 1195 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990). Whitetail contends that this testimony is not relevant to any material issue. We disagree. Her experts both testified that women suffering from battered-woman syndrome sometimes will have episodes of "rebelliousness." Transcript at 428 (Testimony of Susan Patterson); *see also* Transcript at 491–92 (Testimony of Dr. Zimmerman) ("sporadic fighting back"). Here, an issue before the jury, one concerning Whitetail's intent or state of mind, was whether she stabbed McKay during one of these sporadic incidents of rebellion. The testimony regarding the two prior knife incidents tends to show that she had been thinking about stabbing McKay for some time, and thus this testimony tends to negate the conclusion that the stabbing was the result of a sporadic incident of rebelliousness. Moreover, as this testimony relates directly to the issue of Whitetail's intent or state of mind when she stabbed McKay, we reject her claim that its probative value was substantially outweighed by its prejudicial effect. The testimony regarding the knife-wielding incidents appears to satisfy the *Dobynes* test, and in any event its admission certainly does not constitute plain error.

### III.

■ Finally, Whitetail contends that her sentence is illegal because the District Court, when it sentenced her, incorrectly believed that it could not depart from the guidelines on the basis of her battered-woman defense once the jury had considered and rejected that defense. She supports this claim by quoting the District Court at sentencing:

> I'm convinced, as the government attorney has announced, that battered woman is not a part of this case for this Court to consider.... I cannot be blinded to the fact that the jury having heard the evidence and having two positions presented to it in a very forthright fashion chose to determine that the defendant was guilty of second degree murder, thereby in this Court's mind clearly rejecting battered woman syndrome from the facts of this case. Battered woman syndrome will not be considered by this Court in passing sentence. It does not exist in this case. The jury has so found.

Sentencing Transcript at 18. The government responds that the District Court did consider the battered-woman defense but chose not to depart from the guidelines on

that basis, and it points out, correctly, that such an exercise of discretion by a sentencing judge is not subject to review. *See United States v. Evidente*, 894 F.2d 1000, 1004 (8th Cir.), *cert. denied*, 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990).

On the other hand, a claim that the District Court incorrectly concluded that it was without legal authority to consider a mitigating factor relevant to a downward departure is subject to appellate review. *United States v. Brown*, 903 F.2d 540, 545 (8th Cir.1990); *see also* 18 U.S.C. § 3742(e)(1) & (2) (1988). Where a sentencing court evidences a mistaken belief that it lacks authority to depart from the guidelines, the appropriate remedy is for the appellate court to remand the case "with instructions allowing, although not directing, the judge to consider whether departure is warranted," *Brown*, 903 F.2d at 545, on the basis of the incorrectly omitted mitigating factor.

We are faced here with the same issue addressed by the Third Circuit in *United States v. Cheape*, 889 F.2d 477 (3rd Cir. 1989). There, a jury convicted defendant Klinefelter on one count of bank robbery and one count of bank robbery by use of a dangerous weapon despite her defense that she had participated in the crimes only because of the coercion and duress imposed upon her by her co-defendants. At sentencing she argued that a downward departure from the guidelines was warranted as the coercion and duress imposed upon her by her co-defendants mitigated her wrongful conduct. The district court agreed, but refused to depart because it believed the jury's verdict precluded departure on that basis.

The court of appeals disagreed. It initially observed that, because a successful claim of coercion or duress constitutes a complete defense, these defenses could be relevant at sentencing only when they are not successful at trial. It then reasoned that if the guideline provision specifically stating that downward departure may be made because of coercion or duress "is to be accorded meaningful status ... we must read it as providing a broader standard of coercion as a sentencing factor than coercion as required to prove a complete defense at trial." *Id.* at 480. The court also observed that coercion, as a complete defense at trial, involves proof of substantially different elements than does coercion as a mitigating circumstance during sentencing. It therefore held that the jury's rejection of the defendant's coercion defense did not bar the consideration of that defense as a basis for departure from the guidelines. *Id.*

The same reasoning applies here. Whitetail submitted evidence of battered-woman syndrome, not as a defense in itself, but as the primary component of her claim of self-defense. *See* Final Instruction No. 22, *United States v. Whitetail*, No. C2–90–88 (D.N.D. Filed Dec. 21, 1990) (instructing jury that battered-woman syndrome may be relevant to issue of self-defense). If her claim of self-defense had been accepted by the jury, this defense would have resulted in her acquittal. Thus, to the extent that the guidelines permit consideration of the battered-woman syndrome as a mitigating factor at sentencing, we must read them as "providing a broader standard" for proof of the syndrome than that which is "required to prove a complete defense at trial." *Cheape*, 889 F.2d at 480.

For Whitetail's self-defense claim to be a complete defense at trial, it was required that the jury find that Whitetail "had reasonable grounds to believe and actually did believe that she was in imminent danger of death or great bodily harm," which she could avoid "only by using deadly force." Final Instruction No. 17, *United States v. Whitetail*, No. C2–90–88 (D.N.D. Filed Dec. 21, 1990); *see also Beard v. United States*, 158 U.S. 550, 564, 15 S.Ct. 962, 967, 39 L.Ed. 1086 (1895) (defendant may use "such force as ... [s]he, at the moment, honestly believe[s], and ha[s] reasonable grounds to believe, [is] necessary to save [her] own life, or to protect [herself] from great bodily injury."). In contrast, the provision of the Sentencing Guidelines upon which Whitetail bases her departure argument permits the district court to "reduce the [defendant's] sentence below the guideline range" if it finds that "the victim's

wrongful conduct contributed significantly to provoking the offense behavior." U.S.S.G. § 5K2.10, p.s. (Nov. 1990). Thus, to the extent that U.S.S.G. § 5K2.10, p.s., permits consideration of battered-women syndrome as a basis for departure from the guidelines, it does not require proof of the same elements necessary to establish a claim of self-defense at trial. As a consequence, the fact that the jury rejected Whitetail's claim that she acted in self-defense did not remove from the District Court its discretion to consider at sentencing her battered-woman evidence as a basis for departure from the guidelines.

Here, our examination of the Sentencing Transcript leads us to conclude that the District Court did not exercise its discretion and choose not to depart downward on the basis of the battered-woman defense, but rather that it believed the jury's verdict foreclosed consideration of Whitetail's evidence that she was a battered woman and had reason to fear McKay. In concluding that it was thus foreclosed, the District Court erred as a matter of law. It therefore is necessary for us to vacate Whitetail's sentence and to remand the case for resentencing, so that the District Court may consider whether departure is warranted. We emphasize that at resentencing the question of whether a downward departure should be granted lies within the sound discretion of the District Court. We hold only that the District Court is not foreclosed by the jury verdict from considering a downward departure on the basis of Whitetail's battered-woman evidence.

### IV.

For the reasons set forth above, we affirm Emrolyn Whitetail's conviction, vacate her sentence, and remand for resentencing in accordance with this opinion.