# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1127

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| James L. Parker, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: June 11, 2003
Filed: April 20, 2004 (Corrected: May 5, 2004)

_____

Before MELLOY, HANSEN, and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

James L. Parker was charged in a twenty-count indictment with one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, eight counts of mail fraud in violation of 18 U.S.C. § 1341, and eleven counts of money laundering in violation of 18 U.S.C. § 1956. A jury convicted him of each of these charges, and the

district court[1] sentenced him to fifty-one months imprisonment and ordered him to pay restitution in the amount of $704,720.00. Parker appeals his conviction, making several challenges to the sufficiency of the evidence, evidentiary rulings, and the jury instructions. We affirm.

## I.

On April 12, 2000, a federal grand jury in the Western District of Missouri indicted Parker, his son, Ethan Parker, and Lyle Perry on charges arising out of their business activities with Parker's corporation, FCI Marketing, Inc. ("FCI"). All three co-defendants were charged with conspiracy to commit mail fraud. Only Parker and Perry, FCI's vice president, were charged with mail fraud, while Parker alone was charged with money laundering.

In 1981, Parker, together with his wife, formed FCI's predecessor company, Factory Connections, Inc. That company foundered, and it filed bankruptcy in 1987. Burdened by personal, as well as corporate, debt, the Parkers themselves also filed a petition for bankruptcy in 1988. The Parkers revamped their business approach and, in June of 1989, founded FCI. James Parker functioned as the president and controlling partner.

Parker's concept in forming FCI was to sell exclusive distributorships to investors who would sell FCI brand-name automotive parts on a consignment basis. In exchange for an initial investment of between $30,000-$250,000 (depending on the initial package of inventory and the size of the investor's territory), FCI agreed not to set up other distributorships within the boundaries of the agreed-upon exclusive geographic territory. In addition, FCI's sales teams traveled to the

---

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

distributors' territories and set up accounts with garages.  After an account was established, the sales teams installed FCI cabinets and racks at these locations and stocked them with FCI brand products, namely brakes, spark plugs, belts, tire repair kits, starters, alternators, and other commonly used aftermarket automobile parts.

The investors, or "distributors," serviced these garages and replaced the depleted inventory with parts that the distributors purchased directly from FCI. When servicing the garages, the distributors also collected money for the parts that the garages' mechanics had used since the last servicing. Therefore, distributors paid FCI for the inventory they used to stock garages, but the distributors themselves did not receive any payment for the products until mechanics actually used them.  The distributors maintained a line of credit with FCI so that they could adequately service their accounts.

Investors' execution of Parker's consignment-based business model proved considerably more difficult to carry out successfully than Parker advertised orally and in printed media.  At trial, the government sought to prove that Parker, in conjunction with his co-defendants, fraudulently induced investors to purchase FCI distributorships by making several false statements.  The substance of these statements concerned the quality of the automotive parts sold under the FCI brand name, the quality of the distributorship accounts, FCI's business history, and the amount of actual and projected income.

For example, Parker's written promotional packages touted FCI products as being of the highest quality.  However, the evidence at trial showed that many of the products, particularly the starters, alternators, and brakes, were of substandard quality.  This poor quality created friction between the distributors and the garages that used these FCI products.  Parker himself claimed in a 1996 lawsuit against his brake manufacturer that the brakes were subject to premature wear, squealing, and disintegration and that FCI lost distributorships as a result of the problems.

Moreover, in a 1996 civil deposition, Parker claimed FCI had lost thirteen distributors as a result of the inferior quality of the starters and alternators. Even so, when distributors complained to Parker about the products, Parker assured the complaining distributors that they were the only ones experiencing recurrent problems. In addition, testimony at trial established that Parker often responded to these complaints by accusing the mechanics of improperly installing the FCI products, which exacerbated the tension between the distributors and the garages.

Parker also represented that FCI would provide distributors with a professional sales staff to set up high quality accounts. He described the accounts as garages that employed several mechanics and had two or more bays. Instead, the government alleged that the "professional" sales team members had little to no training and that the accounts were oftentimes no more than dump sites for the sales person's inventory. There was evidence that FCI sales teams had set up accounts at a bait shop and at a junk yard and that, in order to entice garage owners to accept an FCI account, sales members would tell the owners that they need not use the product but could keep it on hand for emergencies. The government alleged that Parker knew of these deficiencies but continued to promote his sales staff as a professional one that would establish income-producing accounts at high volume garages.

What is more, FCI promotional materials included documentation concerning the profitability of owning an FCI distributorship. The figures contained in these materials were compiled by Parker and co-defendant Perry, who was a certified public accountant. In 1993, at FCI's annual seminar, Parker circulated an informal income and sales survey. The idea to conduct such a survey was an impromptu one, and distributors were told to estimate their sales revenues. Based on these responses, Perry compiled a chart of gross and net incomes for the current year and, based on a 10% yearly growth rate, projected gross and net income for the following two years.

In 1994, Parker again surveyed distributors at FCI's annual convention. The figures obtained from this survey were significantly lower than the 1993 figures, and Parker and Perry compiled a new chart with the updated 1994 figures. When the survey showed yet another decline in income in 1995, Parker did not update his promotional materials with the 1995 figures. Instead, he continued to provide prospective investors with the 1994 chart. Moreover, the 1994 chart continued to show a 10% annual increase in sales and profits even though the results of Parker's survey showed a decline in income for two consecutive years. After 1995, Parker did not conduct any further surveys, nor did he tell new distributors that the most current data showed significantly less profitability and growth than the information he provided them.

Representations concerning the profitability of an FCI distributorship, the projected incomes, the professionalism of FCI's sales staff, and the quality of its goods and accounts were not the only bases of the crimes charged in the indictment. At trial, the government produced evidence of other alleged misrepresentations Parker made that tended to prove his intent to deceive and to induce potential investors into buying FCI distributorships. Like the above-mentioned statements, these other misrepresentations were mailed to interested investors as part of FCI's promotional literature packet. For instance, the government alleged that Parker falsely represented to potential investors that FCI distributorships were 100% successful when, in fact, Parker knew of failed distributorships and of distributorships that were not profitable. Similarly, in print media, FCI advertised that it was "Number 1," and the advertisement further indicated that this ranking was based on an "Independent survey conducted by FCI Marketing Inc." No such survey had ever been conducted.

FCI was headquartered in St. Joseph, Missouri, and prospective investors commonly traveled to FCI headquarters to meet with Parker before purchasing distributorships. As part of Parker's sales pitch to several investors, he informed

them that the profitability of his son, Ethan Parker's, distributorships was typical. Parker failed to inform prospective investors, however, that his son received substantial inventory free of charge and had a much higher line of credit than ordinary distributors. The government alleged that Parker's representations regarding the normalcy and the profitability of his son's distributorships were made (or omitted) with the fraudulent intent of inducing and deceiving prospective investors.

## II.

Parker's first point of contention on appeal concerns the trial court's admission of the expert testimony of Steven Toporoff. Toporoff is a government lawyer with the Federal Trade Commission. His job title, specifically, is Franchise Program Coordinator. The thrust of his testimony summarized the scope and substance of the so-called Federal Trade Commission's "Franchise Rule." Without offering any opinion as to whether or not FCI distributorships were "franchises" within the meaning of the Franchise Rule, Toporoff testified as to the Federal Trade Commission's definition of a franchise and the disclosure obligations under federal franchise law that accompany classification as a franchise.

Toporoff testified that the Franchise Rule requires that a franchisor make several disclosures to potential investors. First, a franchisor must disclose the total number of franchises that have opened, as well as the total number of those that have closed. In addition, a franchisor must disclose its litigation history to the extent it implicated the franchisor's wrongdoing . Franchisors are also required to disclose all bankruptcy proceedings in which the franchise or its principals have been involved. And while the Franchise Rule does not require that a franchisor make any financial disclosures, it governs those that are made. For example, a statement as to historical performance must meet generally accepted accounting principles, and a projection must proceed from a reasonable basis.

At trial, Parker's counsel objected to Toporoff's testimony on relevancy grounds, while counsel for his co-defendant, Perry, objected to the testimony on the ground it constituted an impermissible legal conclusion. The trial judge overruled the objections, agreeing with the government's contention that the testimony was properly admissible to show intent and motive. At Parker's request, the court did, however, give the jury the following cautionary instruction at the conclusion of Toporoff's testimony:

> I advise you that whether FCI, that is the corporation that we're [sic] been talking about, whether FCI created franchises is not something that the witness established by his testimony. He wasn't asked that; he didn't answer any such question. The question of whether a franchise or franchises were created by FCI with regard to its distributorships is something that would have to be determined to the extent it is pertinent by other evidence in the case.

> And I further remind you that even if FCI did create franchises, this prosecution is not a lawsuit claiming violation of the Federal Trade Commission, FTC requirements. The question in this case, at least one of the ultimate questions, would be whether one or more of the defendants knew of the obligations under the FTC written rules, whether one or more of them knew of the obligations and failed to comply in order to hide things from the investors and to deceive them into becoming distributors.

Parker did not object to the substance of this cautionary instruction.

On appeal, Parker argues the trial court erred in admitting Toporoff's testimony for three reasons. First, Parker contends the testimony invaded the province of the judge and the jury because it constituted opinion testimony concerning legal standards. Second, he reasserts his relevancy objection. And third, for the first time, he argues that, even if the testimony were relevant, the district court should have

excluded it under Federal Rule of Evidence 403 because, according to Parker, its probative value was substantially outweighed by its prejudicial effect.

We review the district court's decision to admit evidence over a party's objection for abuse of discretion. United States v. Rock, 282 F.3d 548, 551 (8th Cir. 2002). The government argued, and the trial court found, that the testimony was properly admissible to show Parker's intent to deceive. We agree.

Among other charges, Parker was convicted of mail fraud in violation of 18 U.S.C. § 1341. This statute prohibits the use of the mails to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Intent to defraud is an essential element of proving a violation of 18 U.S.C. § 1341. See United States v. Manzer, 69 F.3d 222, 226 (8th Cir. 1995) (to prove a violation of 18 U.S.C. § 1341, government must establish "(1) the existence of a scheme to defraud, and (2) the use of the mails . . . for purposes of executing the scheme"). Toporoff's testimony was relevant to establishing this essential element.

Toporoff did not testify that FCI distributorships were franchises subject to the Federal Trade Commission's Franchise Rule. Thus, contrary to Parker's assertion, Toporoff did not offer an impermissible legal opinion. He testified as to the scope and obligations of the rule. Other evidence supported a finding that FCI distributorships were, in essence, franchises. For instance, in the late 1980's, the State of Nebraska sent Parker a letter, in which it informed him that FCI may be subject to compliance with Nebraska's seller-assisted marketing regulations. In addition, Parker's promotional materials indicated that the information contained therein was given in compliance with state and federal regulations, and the referenced information included disclosures that Toporoff testified were required by the Franchise Rule.

The most telling evidence that Parker believed he was marketing franchises and was subject to compliance with the Franchise Rule was a document drafted by his attorney. In 1995, Parker contemplated expanding FCI and incorporating a new business entity, FCI Franchising, Inc. While Parker ultimately did not pursue this venture, the document describes the FCI Franchising, Inc.'s franchises as similar to the distributorships offered by FCI Marketing, Inc. Indeed, the description of FCI Franchising, Inc.'s franchises is identical in substance to that of an FCI Marketing, Inc. distributorship: "FCI [Franchising, Inc.] sells franchises to operate distributorships which sell aftermarket autoparts on consignment to automobile repair shops, service centers, and repair garages," while FCI Marketing, Inc. similarly consists of "a marketing program of placing assortments of major product lines on consignment at Automotive Repair Shops and Garages."

In short, the government presented sufficient evidence from which a reasonable jury could have found that FCI was subject to the Franchise Rule, that Parker knew he was selling franchises, and that he was aware of the obligations of the Franchise Rule. Therefore, Toporoff's testimony concerning the scope and substance of the rule was relevant, as indicated by the trial judge in his cautionary instruction, to show Parker's intent to deceive if he knowingly failed to comply with the rule. The jury was not compelled to make such an inference, and the trial judge specifically instructed the jury that Toporoff's testimony was relevant only if other evidence established that FCI distributorships were subject to the Franchise Rule. Under these circumstances, the trial court did not abuse its discretion in admitting Toporoff's testimony over Parker's relevancy objection, especially in light of the cautionary instruction that limited the jury's use of the testimony to the issue of Parker's intent to deceive.

Confronted with an almost identical argument to Parker's, the Fifth Circuit Court of Appeals affirmed the admission of evidence of violations of civil banking

regulations in a bank fraud trial. In United States v. Harvard, 103 F.3d 412 (5th Cir. 1997), the court held that evidence of banking regulations violations was relevant to show the defendant's motive or intent. Id. at 422-23. The court reasoned that the regulations,

> tended to prove that Harvard had a motive to make false entries in order to hide the nature of the sham loan . . . . Evidence that Harvard's non-disclosure of the "consulting fee" was in violation of civil banking regulations went toward showing Harvard's knowledge of his duty to disclose the fee and his motivation to hide his receipt of the fee.

Id. at 422.

In yet another similar case to come before the Fifth Circuit, the court in United States v. Parks, 68 F.3d 860 (5th Cir. 1995), affirmed the district court's admission of evidence of civil banking regulations on the ground that the evidence was relevant to show intent and motive. Id. at 866-67. In that bank fraud case, the court held, "Evidence of violations of civil banking regulations cannot be used to establish criminal conduct. Evidence of such violations may, however, be admitted for the limited purpose of showing the defendants' motive or intent to commit the crime charged." Id. at 866 (internal citations omitted). As in Harvard and Parks, the government in the present case was charged with proving intent to defraud, and the district court took painstaking care to guard against the possibility that the defendant would be convicted of a federal crime because he violated civil regulations.

The paramount concern for the trial judge in these types of cases is not one of relevancy, because, as discussed above, evidence of civil violations is clearly relevant insofar as a defendant's knowledge and violation of the regulations are relevant to show intent and motive. Instead, the question is one of undue prejudice. The district courts in Harvard, Parks, and in the present case recognized the potential for unfair

-10-

prejudice and confusion and guided the juries' use of such evidence by instructing the juries as to its proper, limited use.

Moreover, Parker did not object to Toporoff's testimony at trial as being unduly prejudicial, and we are not swayed by his Rule 403 argument on appeal, particularly in light of the district court's cautionary instruction. The Federal Rules of Evidence instruct that relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. To the extent Toporoff's testimony implicated Rule 403 concerns, the district court adequately minimized the testimony's prejudicial impact. The court instructed the jury regarding the Federal Trade Commission regulatory evidence and guided the jury's consideration of such evidence by way of a cautionary instruction, which immediately followed Toporoff's testimony. The district court was mindful of the potential prejudice that this testimony could have on Parker's trial and, accordingly, explicitly admonished the jury that the trial was "not a lawsuit claiming violation of the Federal Trade Commission, FTC, requirements."

We conclude that, in light of the court's cautionary instruction and able guidance to the jury, the court did not abuse its discretion, much less commit plain error,[2] in admitting Toporoff's testimony. The trial judge employed appropriate measures to prevent undue prejudice and jury confusion that otherwise could have resulted from evidence that Parker may have violated Federal Trade Commission civil

---

[2]Parker did not object to the admission of Toporoff's testimony on the ground it was unduly prejudicial. Instead, he objected to the testimony as irrelevant. To the extent that Parker's appeal is based on evidence to which he did not object at trial, our standard of review is plain error. See United States v. Whitetail, 956 F.2d 857, 861 (8th Cir. 1992).

regulations. Therefore, we conclude that the trial court properly admitted Toporoff's testimony for the limited purpose of showing intent and motive.

## III.

We turn next to Parker's second argument for reversal—that is, whether the government presented sufficient evidence to support his mail fraud conviction. Specifically, Parker claims that the government failed to sustain its burden of negating all reasonable interpretations of the allegedly false statements that would render the statements literally true. In the alternative, Parker argues that the trial judge committed plain error in failing to sua sponte instruct the jury that, if under one reasonable construction of the allegedly false statements the statements were factually correct, the jury must return a verdict of not guilty.

## A.

"We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003). "The verdict must be upheld if 'there is an interpretation of the evidence that would allow a reasonable- minded jury to find the defendant[ ] guilty beyond a reasonable doubt.'" United States v. Nambo-Barajas, 338 F.3d 956, 960 (8th Cir. 2003) (quoting United States v. Vig, 167 F.3d 443, 445 (8th Cir. 1999)). The standard of review is, thus, a strict one, and a jury's verdict will not be lightly overturned. "Reversal is appropriate only where a reasonable jury could not have found all the elements of the offense beyond a reasonable doubt." United States v. Armstrong, 253 F.3d 335, 336 (8th Cir. 2001).

B.

To prove mail fraud, the government bore the burden of proving: (1) a scheme to defraud by means of material false representations or promises, (2) intent to defraud; (3) reasonable foreseeability that the mail would be used, and (4) the mail was used in furtherance of some essential step in the scheme. 18 U.S.C. § 1341; see also United States v. Frank, 354 F.3d 910, 916 (8th Cir. 2004) (conviction under 18 U.S.C. § 1341 requires proof that the defendant "voluntarily and intentionally devised or participated in a scheme to defraud the United States by concealing his assets, that he entered into the scheme with the intent to defraud, that he knew that it was reasonably foreseeable that the mails would be used, and that he used the mails in furtherance of the scheme"). Parker's challenge to the sufficiency of the evidence implicates only the first element—that is, whether the government proved the falsity of his statements. The government alleged that the scheme to defraud in this case consisted of Parker making a number of false representations, nine of which the district court enumerated in its instructions to the jury. To support his conviction, the government must have proved that Parker knowingly made at least one of the nine false representations as part of the scheme to defraud.

Parker relies on United States v. Anderson, 579 F.2d 455 (8th Cir. 1978) for the proposition that the government was required to disprove all interpretations of his allegedly false statements that would render them factually true. First, it is not altogether clear whether there is a legal basis for Parker's argument because the cases he cites refer to an external source of ambiguity. E.g., United States v. Whiteside, 285 F.3d 1345, 1351-52 (11th Cir. 2002) ("In a case where the truth or falsity of a statement *centers on an interpretive question of law*, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.") (emphasis added); United States v. Prigmore, 243 F.3d 1, 18 (1st Cir. 2001) (looking to defendant's asserted reasonable

-13-

interpretation of federal regulation and stating, "if the evidence at trial gives rise to a genuine and material dispute *as to the reasonableness of a defendant's asserted understanding of applicable law*, the judge, and not the jury, must resolve the dispute") (emphasis added); United States v. Rowe, 144 F.3d 15, 21-23 (1st Cir. 1998) (finding that government bore burden of negating reasonable interpretations because a reasonable interpretation of the underlying disclosure requirement would render the defendant's statement true); United States v. Migliaccio, 34 F.3d 1517, 1523-25 (10th Cir. 1994) (reversing and remanding for new trial where district court refused to instruct on ramifications of ambiguity of healthcare reporting procedures in a mail fraud case); Anderson, 579 F.2d at 459 (finding government had duty to disprove defendant's interpretations of statements where ambiguity arose from certification clauses in defendant's reimbursement invoices). Nevertheless, for the reasons stated below, we need not reach that issue today.

In Anderson, the defendant was convicted of making false statements in matters within the jurisdiction of a federal agency, to wit, the Federal Highway Administration. Anderson, 579 F.2d at 457. The events that gave rise to the charges against Anderson arose out of a federally-funded road construction project. Id. The defendant obtained certain materials and labor free of charge through an unrelated federal reimbursement program. Id. Nevertheless, he submitted a claim to the Federal Highway Administration for full reimbursement without disclosing that he had been reimbursed for some costs under the unrelated federal program. Id. The defendant, therefore, was reimbursed twice for the same work. Id. at 457-58.

In submitting his claim for reimbursement to the Federal Highway Administration, the defendant certified that "funds have not been received from the State or expended for such services under any other contract agreement or grant." Id. at 459. The government alleged that this certification was false. Id. On appeal after his jury conviction, the defendant argued that the government failed to prove the

falsity of his statement because a host of reasonable interpretations would have rendered the ambiguous certification statement true. Id. The Anderson court agreed and held that, when the statement alleged to be false is facially ambiguous, "it [is] incumbent upon the government to introduce proof sufficient to establish the falsity of the statements as well as the defendant's knowing and willful submission of the statements. In carrying out that burden the government must negative any reasonable interpretation that would make the defendant's statement factually correct." Id. at 460.

Parker's reliance on Anderson is misplaced. We held in Anderson that the government bears the burden of negating literally truthful interpretations of statements in a fraud case when the statements (1) are ambiguous and (2) are subject to *reasonable* interpretations. See id.; accord United States v. Colin Anderson, 879 F.2d 369, 376-77 (8th Cir. 1989) (rejecting contention that government bears burden to disprove all of defendant's interpretations of allegedly false statement and holding that government bears burden to "negative only any reasonable interpretation of an ambiguous statement. The statements at issue here—'never been in force' and 'null and void'—have accepted meanings. It was the jury's role then to determine whether Lundin made these unambiguous statements with the required knowledge that they were false."). Parker's statements were neither facially ambiguous, nor were they subject to multiple reasonable interpretations. Consequently, under the facts of this case, the government did not have the burden to negate the stretched interpretations Parker now offers on appeal.

To accept Parker's argument that the government failed to sustain its burden of proof at trial, we would have to find that statements, such as FCI had been in business since 1977, FCI was ranked "Number 1" based on an independent study, FCI's "planned program" was 100% successful, FCI supplied the best quality auto parts, and FCI established high quality accounts for distributors, were ambiguous and

subject to multiple rational interpretations. See Anderson, 579 F.2d at 460. Even under the most generous construction of ambiguity, Parker's statements are clear and are not subject to reasonable interpretations that would render them true. Unlike Anderson, there is nothing facially ambiguous about Parker's statements. To the extent Parker offered differing explanations of the meaning of his statements, the jury evidently rejected them, and we cannot say that its conclusion was not based on sufficient evidence.

For the same reasons discussed above, the district court did not commit plain error in failing to sua sponte give an instruction on the additional proof required if ambiguity were found to reside in Parker's statements. Defendants are entitled to instructions on their theories of defense only insofar as those theories are supported by an adequate factual basis. See, e.g., Mathews v. United States, 485 U.S. 58, 63 (1988) (stating that defendant is "entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor"). Parker's strained interpretations of facially unambiguous statements do not entitle him to an instruction on this theory, and certainly the district court's failure to sua sponte give such an instruction does not rise to the level of clear error. Moreover, even if he had been entitled to it, there was more than sufficient evidence at trial to negate all interpretations of Parker's statements that would have made them literally truthful. Therefore, to the extent any error was committed, it was harmless.

In short, we have examined the evidence in the light most favorable to the government and have considered each of Parker's arguments urging reversal of his mail fraud conviction. We conclude that the evidence was sufficient to sustain the conviction. Moreover, the errors that Parker claims require reversal in this case, even if committed, were harmless. This is so because the evidence, viewed as a whole, strongly demonstrates the falsity of Parker's statements. And because Parker's statements were not facially ambiguous and because they were not subject to any

reasonable interpretations, the district court did not commit clear error by failing to sua sponte instruct the jury on the legal effect of an interpretation that would make the statements literally correct. Accordingly, we affirm the district court's denial of Parker's motion for new trial.

IV.

Parker's third argument on appeal posits that the trial court abused its discretion in submitting a "deliberate ignorance" instruction to the jury because the evidence showed actual, not constructive, knowledge. "[I]n reviewing a district court's decision to give a willful blindness instruction, we must review the evidence and any reasonable inference from that evidence in the light most favorable to the government." United States v. Hiland, 909 F.2d 1114, 1131 (8th Cir. 1990). In this case, the district court instructed the jury that it could find that Parker acted "knowingly" if it found that he,

> was aware of a high probability that the gross sales and gross projections overstated the average gross sales and gross profits of FCI Marketing Distributors in 1993 and 1994, and that he deliberately avoided learning the truth. The element of knowledge may be inferred if Defendant James L. Parker deliberately closed his eyes to what would otherwise had been obvious to him.

Parker argues that the willful blindness instruction created an impermissible risk that the jury would convict him by applying a negligence standard. We have recognized that the willful blindness instruction "should not be given . . . when the evidence 'points *solely* to either actual knowledge or no knowledge of the facts in question.'" United States v. Regan, 940 F.2d 1134, 1136 (8th Cir. 1991) (emphasis added) (quoting Hiland, 909 F.2d at 1130). However, "'even where there is evidence of actual knowledge, a willful blindness instruction is proper if there is sufficient evidence to support an inference of deliberate ignorance.'" United States v.

-17-

Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993) (quoting Hiland, 909 F.2d at 1130-31); accord United States v. Ruhe, 191 F.3d 376, 384 (4th Cir. 1999) ("If the evidence supports both actual knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper."); United States v. Kellermann, 992 F.2d 177, 179 (8th Cir. 1993) (holding district court did not err in giving willful blindness instruction where "a reasonable jury easily could find beyond a reasonable doubt that Kellermann *either* had actual knowledge of his wrongdoing in making false statements . . . *or* deliberately failed to make detailed inquiry into KT & R's activities before making such statements") (emphasis added).

The district court in Parker's case did not commit reversible error in giving the willful blindness instruction because there was evidence of both actual and constructive knowledge. The evidence of actual knowledge included Parker's response to questioning during an interview with a Federal Bureau of Investigation special agent. When asked about the inflated income projections that Parker provided to distributors, Parker acknowledged that the most recent data from 1995 showed a decline in income. According to the special agent's testimony, Parker stated, "I guess they are [lower]. I guess I should have updated these things with the new information." At the same time, however, there was also evidence that Parker remained willfully blind to the inaccuracy of the data by not conducting any surveys after the 1995 survey showed a decline in income for the second consecutive year. Therefore, because the evidence viewed in the light most favorable to the government showed that Parker intentionally remained ignorant of the true facts and had actual knowledge, we will not disturb the district court's decision to submit the deliberate ignorance instruction to the jury.[3]

_____

[3]To the extent Parker complains that the willful blindness instruction created a risk that he would be convicted on a mere negligence standard, any such danger was adequately addressed by the court's admonition to the jury,

V.

Parker also challenges the sufficiency of the evidence regarding his money laundering and aiding and abetting money laundering convictions under 18 U.S.C. § 1956 and 18 U.S.C. § 2, respectively. To support these convictions, the government was required to prove that Parker "'engaged in financial transactions with the knowing use of the proceeds of illegal activities' and with the 'intent to promote the carrying on' of unlawful activity." United States v. Jolivet, 224 F.3d 902, 909 (8th Cir. 2000) (quoting United States v. Hildebrand, 152 F.3d 756, 762 (8th Cir. 1998)). Parker contends that the government failed to establish the "intent to promote" element of the charge because the allegedly laundered money was used to pay for auto parts and supplies that had already been delivered by the vendors to the distributors. Hence, contrary to the government's assertion that the money was reinvested and used to purchase auto parts to resupply distributors, Parker contends that the money was used to pay vendors for an antecedent unlawful activity.

As noted above, we review Parker's challenge to the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government. E.g., United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003). We accept as established all reasonable inferences that support the verdict. See United States v. Hawkey, 148 F.3d 920, 923 (8th Cir. 1998). The transactions the indictment charged as money laundering consisted of expenditures, paid by checks written by FCI, that allegedly promoted the fraudulent distributorship scheme. These

---

You may not find that the defendant acted knowingly, however, if you find that the defendant did not personally sponsor the figures or that he actually believed that the gross sales and gross profits projections for 1993 or 1994 were as represented, or if you find that the defendant James L. Parker was simply careless or inattentive. A showing of negligence, mistake, or carelessness is not sufficient to support a finding of knowledge.

-19-

checks were signed by Ralph Stover, who was FCI's secretary and treasurer. His duties required him, among other responsibilities, to negotiate checks on behalf of FCI to pay automotive parts manufacturers and vendors.

For reversal, Parker relies primarily on our decision in <u>Jolivet</u>. In that case, a jury convicted the defendant of mail fraud, money laundering, and conspiracy. <u>Jolivet</u>, 224 F.3d at 905. The defendant and her husband perpetrated four insurance schemes wherein they obtained insurance and then claimed to have caused an accident, submitting false accident claims and false expenses and medical records to their insurance company. <u>Id.</u> On appeal, the defendant challenged the sufficiency of the evidence to support her money laundering convictions on the ground that depositing the proceeds of her insurance scams and making the funds available for use was not enough to prove the "intent to promote the carrying on" element of money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). <u>Id.</u> at 909.

The <u>Jolivet</u> court agreed, explaining:

> In order to be found guilty of money laundering under § 1956(a)(1)(A)(i), the government must prove that the defendant "engaged in financial transactions with the knowing use of the proceeds of illegal activities" and with the "intent to promote the carrying on" of unlawful activity. <u>Hildebrand</u>, 152 F.3d at 762 (quoting § 1956(a)(1)(A)(i)). Thus, although the prohibited conduct is characterized as money laundering, it is different from traditional money laundering because the criminalized act is the reinvestment of illegal proceeds rather than the concealment of those proceeds. <u>See id.</u> (contrasting § 1956(a)(1)(A)(i)'s prohibition of reinvestment money laundering to § 1956(a)(1)(B)(i)'s prohibition of concealment money laundering).
>
> . . . .

-20-

The government must prove that the defendant, using illegally-gained proceeds, undertook a financial transaction "with the intent to promote the carrying on of specified unlawful activity." § 1956(a)(1)(A)(i). It is true that the deposit of funds in a bank account may promote an antecedent unlawful activity by making the funds available to the wrongdoer. However, the government bears the burden of proving that the money was used to further the *carrying on* of such illegal activity. We find no logic in the government's suggestion that Jolivet could promote the carrying on of an already completed crime. Cf. United States v. Edgmon, 952 F.2d 1206, 1214 (10th Cir. 1991) ("Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'").

Id.

In Jolivet, the appellant-defendant's money laundering convictions could not stand because the government did not prove that Jolivet "used the proceeds from any one incident to further [her] future schemes. Rather, the undisputed evidence showed that most of the money went to pay daily living expenses and to pay credit card debt . . . ." Id. at 911. Thus, a money laundering conviction cannot stand where there is "no evidence that the proceeds were used for anything other than personal expenses." Id. However, contrary to Parker's contention, such evidence exists here. The checks on which the money laundering counts against Parker were based were drawn from FCI accounts and written to pay auto parts manufacturers and suppliers. Without the constant resupply of auto parts, Parker could not have continued to operate his fraudulent distributorship scheme. The evidence that Parker reinvested in FCI with funds derived from the fraudulent scheme is sufficient to show that he intended to promote the carrying on of that scheme.

Parker also relies on United States v. Brown, 186 F.3d 661 (5th Cir. 1999) for reversal. In Brown, the defendant operated an automobile dealership and conducted

a significant amount of legitimate business.  Id. at 662-63.  However, he was also engaged in a fraudulent scheme to charge some customers more than the amount authorized by state law for document and title fees.  Id. at 663.  The indictment alleged eighteen instances of overcharging and alleged that the defendant laundered the proceeds of the excessive fees.  Id.  The jury convicted the defendant of money laundering, but the Fifth Circuit reversed this conviction, finding insufficient evidence to establish that the charged expenditures were used with the intent to promote the defendant's fraudulent scheme, as opposed to his legitimate business activities.  Id. at 670.  The evidence showed that the allegedly laundered funds paid for the dealership's basic operations, such as parts, paints, materials, trade-in car purchases, a computer system lease, glass repair, a health plan, coffee mugs, etc.  Id. at 668 n.13.  No evidence linked the charged expenditures to the defendant's scheme to defraud purchasers by overcharging for document and title fees.

In reversing Brown's conviction, the Fifth Circuit recognized that, under some circumstances, "the intent to promote criminal activity may be inferred from the particular type of transaction."  Id. at 670.  For instance, an intent to promote drug trafficking can be inferred where a defendant, who was both a drug dealer and a preacher, purchased beepers because "beepers were not necessary to the defendant's legitimate business operations and played an important role in [the defendant's] drug trafficking scheme."  Id. (referencing United States v. Jackson, 935 F.2d 832 (7th Cir. 1991)).  However, the court found that those circumstances did not exist in Brown.

Parker's reliance on Brown and Jolivet is misplaced, because those cases are factually inapposite to his case.  In Jolivet, the government conceded that it could not trace the use of the insurance scheme proceeds after the defendant withdrew them from her bank account.  Jolivet, 224 F.3d at 911.  In addition, the evidence showed that Jolivet's four insurance scams were not an ongoing criminal enterprise but rather were four discrete unlawful scams.  Id. at 910-11.  In Brown, there was no evidence

-22-

that the defendant's charged expenditures were for items other than "above the board" business expenses. Brown, 186 F.3d at 668-69. In short, what was missing in both Jolivet and in Brown was a nexus between the charged expenditures and a specified criminal activity. Parker, however, was charged to have fraudulently induced investors into buying FCI distributorships by, *inter alia*, misrepresenting the quality of FCI brand automotive supplies. The evidence at trial showed that the charged expenditures paid for belts, filters, tire repair kits, ignition parts, starters, alternators, and brake pads. The supplies were part and parcel of the underlying fraudulent scheme and, therefore, were integral to the transactions from which the jury could reasonably have inferred Parker's intent to promote the fraudulent scheme.

Parker's case is, furthermore, analogous to United States v. Hildebrand, 152 F.3d 756 (8th Cir. 1998). There, we sustained the defendants' money laundering convictions for defendants' participation in a scheme to defraud would-be members of a class action. Id. at 761. In Hildebrand, the defendants formed a group, "We The People." Id. at 760. This group had no legitimate purpose, as it was formed solely to recruit people to join a class action and pay a $300 "administrative fee." Id. No claims were ever submitted to the court, class certification had been denied in the underlying litigation, and the case had ultimately been dismissed. Id. at 761. In analyzing the defendants' sufficiency-of-the-evidence challenges as to their intent to promote an unlawful scheme, we cited the evidence that proceeds from the scheme were used to pay for office supplies, secretarial services, office staff wages, and reimbursement to claims writers for promotional expenses and commissions on fees collected from fraud victims. Id. at 762. The Hildebrand case is instructive because, like the Hildebrand defendants, Parker's distributorship business was ongoing, and he did not conduct any business that was not intimately connected to his fraudulent scheme. The nexus between the unlawful activity and the ill-gotten proceeds in cases like Hildebrand and Parker's case is obvious.

Moreover, we cannot accept Parker's argument that the charged transactions do not support his convictions as a matter of law merely because the expenditures were for the payment of products that had already been delivered to distributors. To do so would be nonsensical and would insulate wrongdoers from criminal prosecution if they simply used a charge account or maintained a line of credit in order to reinvest in their criminal activities. Indeed, in Hildebrand, one of the transactions we cited as supporting the defendants' convictions was payment for services previously rendered by claim writers. Id.

When illegal proceeds are used to reinvest in a fraudulent scheme and when reinvestment is done with the purpose of promoting that scheme, § 1956(a)(1)(A)(i) makes reinvestment criminal. United States v. Oberhauser, 284 F.3d 827, 829 (8th Cir.), cert. denied, 537 U.S. 1071 (2002). Here, the evidence viewed in the light most favorable to the government establishes that Parker engaged in illegal reinvestment money laundering. The principal evidence at trial of Parker's guilt was checks signed by Stover to automotive parts manufacturers. Stover testified that these parts were used to resupply FCI distributors. Without the resupply of inventory, Parker would have been unable to continue his scheme to defraud new and existing distributors. The nexus between his unlawful activity and the ill-gotten proceeds is evident from the nature of the transactions themselves. From this nexus, a reasonable jury could have inferred intent to promote the charged mail fraud conspiracy. Accordingly, we affirm the district court's denial of Parker's motion for new trial on his money laundering conviction.

## VI.

Parker's final argument on appeal concerns the district court's instruction regarding the government's burden of proof to show the interstate commerce component of Parker's money laundering charges. Only days after Parker's trial, in

United States v. Evans, 272 F.3d 1069 (8th Cir. 2001), cert. denied, 535 U.S. 1029 (2002), we held that the Eighth Circuit Model Criminal Jury Instruction 6.18.1956J misstated the government's burden as to the charged transaction's effect on interstate commerce.  Id. at 1081.  The instruction at issue in Evans provided:

> *It is not necessary for the government to show* that a defendant actually intended or anticipated an effect on interstate commerce, *or that commerce was actually affected.*  All that is necessary is that the natural and probable consequences of a defendant's actions would be to affect interstate commerce no matter how minimal.

Id. (quoting jury instruction in defendant's trial).  At Parker's trial, the jury was similarly instructed:

> It is not necessary for the Government to show that the defendant actually intended or anticipated an effect on interstate or foreign commerce, or that commerce was actually affected.  All that is necessary is that the natural and probable consequences of the defendant's action would be to affect interstate or foreign commerce no matter how minimal.

The nearly identical language of the instruction at issue in Evans and in Parker's case compels us to conclude that the instruction given at Parker's trial understated the government's burden of proving the interstate commerce element of the money laundering charges against him.  However, because Parker failed to object at trial, we must consider whether or not Parker was harmed.  See Evans, 272 F.3d at 1081-82 (applying harmless error review).  In Evans, we held that the defendant was not entitled to a new trial even though the interstate commerce instruction was incorrect, because the error was harmless.  Id. at 1082.

In Evans, the transaction at issue was the purchase of a vehicle from a used car dealership.  Id. at 1080.  That alone was sufficient to establish an effect on interstate

-25-

commerce. <u>Id.</u> at 1082. Here, the government proved that two of the banks on which funds were drawn and into which proceeds were deposited were involved in interstate commerce. Counsel for the government explicitly asked the witnesses who were called to testify regarding FCI bank statements whether their banks were involved in transactions that "go from one state to another" and that cross state lines. Both witnesses responded in the affirmative. They each identified loans and money transfers to and from out-of-state banks and specifically identified some of the checks deposited into FCI's account as having originated from out-of-state banks.

In addition, exhibits admitted into evidence indicate that the bank, to wit, Provident Bank, is insured by the Federal Deposit Insurance Corporation. That is enough to show an effect on interstate commerce. <u>See</u> <u>United States v. Wadena</u>, 152 F.3d 831, 853 (8th Cir. 1998) ("The government presented evidence that the checks referenced in Counts 10 through 18 were all deposited in either the First National Bank of Detroit Lakes, Minnesota or the State Bank of Winger, Minnesota. As these institutions are FDIC-insured, the government's evidence that these checks were deposited into these institutions is sufficient proof of an interstate commerce nexus.").

Therefore, as in <u>Evans</u>, the erroneous instruction to which Parker did not object at trial does not require reversal because the government proved the interstate commerce component of the money laundering charges; consequently, Parker was not harmed. In addition, it should also be noted that we "will affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." <u>United States v. Casas,</u> 999 F.2d 1225, 1230 (8th Cir. 1993). In Parker's case, the district court did instruct the jury that it had to find beyond a reasonable doubt that the transactions at issue affected interstate commerce. In listing the elements of the money laundering counts, the first element the jury was instructed to consider was whether Parker "conducted or caused to be conducted a financial transaction which in any way or degree affected interstate commerce." As a whole, then, the instructions adequately contained the applicable law.

## VII.

We have considered each of Parker's arguments, and for the reasons stated above, we affirm the district court.

_____