**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gary A. EDGMON and Jimmy W. Edgmon, Defendants–Appellants.**

Nos. 91–6077, 91–6078.

United States Court of Appeals, Tenth Circuit.

Dec. 20, 1991.

John F. Arens, Arens & Alexander, Fayetteville, Ark. (Marjorie M. Kesl and Lee H. Linzay, Jr., also of Arens & Alexander, and Mack Martin, Oklahoma City, Okl., with him on the brief), for defendants-appellants.

Vicki Zemp Behenna, Asst. U.S. Atty., Oklahoma City, Okl. (Timothy D. Leonard U.S. Atty., with her on the brief), for plaintiff-appellee.

Before BALDOCK and EBEL, Circuit Judges, and ANDERSON, Senior District Judge.[*]

ALDON J. ANDERSON, Senior District Judge.

On December 10, 1990, a jury convicted appellants/co-defendants Gary A. Edgmon ("Edgmon") and Jimmy W. Edgmon ("Edgmon, Sr.") each of four counts of conversion of Farmers' Home Administration collateral in violation of 18 U.S.C. § 658 and one count of conspiracy to convert in violation of 18 U.S.C. § 371. Appellant Edgmon, Sr., was also found guilty of one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Appellants now challenge their convictions arguing that 1) the evidence presented was insufficient to support a finding of intent to defraud; 2) the verdict was contrary to the great weight of the evidence; 3) appellants' due process rights were violated; 4) the prosecution failed to present substantial exculpatory evidence to the grand jury; and 5) the money laundering charge violated the Double Jeopardy Clause.

## I.

Appellants are both farmers in Oklahoma as well as father and son. In October of 1987, Edgmon obtained a loan from the Farmers Home Administration (FmHA) for $200,000. Edgmon granted FmHA a security interest in his cattle and other items to secure the loan. Edgmon made payments on the loan that amounted to $12,800 paid on the principal amount. In August of 1988, Edgmon applied for a new loan of $12,800 which would return him to the $200,000 maximum credit limit. FmHA approved the new loan to Edgmon in October of 1988. Edgmon and FmHA then entered a new loan agreement and Edgmon received the additional funds from FmHA. *See* App. at 137–143(d).

During May, June, and July of 1989, Edgmon sold a substantial number of his cattle that served as security for his FmHA loans. Edgmon sold the cattle through his father, Edgmon, Sr., in four separate transactions. The cattle were sold in Edgmon, Sr.'s name and the purchasers paid for the cattle by issuing checks payable to Edgmon, Sr. Neither FmHA's nor Edgmon's name appeared on the cattle sales in any form. *See, e.g.,* Supp.App. at 41–42 (May 2nd sale).

Sometime before June 24, 1989, Edgmon met with FmHA to apply for a new loan and to update his Farm and Home Plan form kept by FmHA. Edgmon represented to FmHA that he had a total of 450 head of cattle. App. at 181. This number was incorrect in that it failed to account for the cattle already sold by Edgmon in the name of his father, Edgmon, Sr. As a result of Edgmon's request for a new loan, FmHA scheduled with Edgmon a collateral inspec-

---

[*] Honorable Aldon J. Anderson, Senior United States District Judge for the District of Utah, sitting by designation.

tion of his farm for August 8, 1989. Edgmon failed to appear for the inspection. FmHA rescheduled the inspection for August 11, 1989. On August 11, 1989, Edgmon appeared at the FmHA office and informed an FmHA representative that he had sold his cattle securing his previous FmHA loans. Trans. Vol. I at 56. On August 11, 1991, FmHA sent a letter to Edgmon demanding restitution of the proceeds of the sale of the collateral, approximately $140,000, and warning that if he failed to resolve the problem, FmHA would refer the claim for criminal prosecution. App. at 182(a). The problem was not resolved and FmHA referred the matter to the United States Attorney's Office. After a trial, a jury returned criminal convictions against Edgmon and Edgmon, Sr., for selling chattel securing FmHA loans without authorization and conspiring to convert the chattel. The jury also convicted Edgmon, Sr., of money laundering. Both challenge their convictions.

## II.

### A. Motion For Judgment Of Acquittal.

■ Appellants both assert that the trial court erred in denying their motions for judgment of acquittal based on insufficiency of the evidence presented. On appellate review of a denial of "a motion for acquittal under Fed.R.Crim.P. 29(a), the issue is whether, taken in the light most favorable to the government, there is substantial evidence from which a reasonable jury might properly find the defendant guilty beyond a reasonable doubt." *United States v. Johnson*, 911 F.2d 1394, 1399 (10th Cir.1990) (citation omitted). Defendants argue that substantial evidence does not exist to support their convictions for conversion and conspiracy to convert. Defendant Edgmon, Sr., also alleges that his conviction for money laundering is not supported by substantial evidence.

### 1. Conversion and Conspiracy to Convert.

The jury convicted defendants of four counts each of conversion in violation of 18

U.S.C. § 658. Section 658 provides in pertinent part:

> Whoever, with intent to defraud, knowingly conceals, removes, disposes of, or converts to his own use or to that of another, any property mortgaged or pledged to, or held by, ... the Secretary of Agriculture acting through the Farmers' Home Administration, ... shall be fined ... or imprisoned ... or both.

18 U.S.C. § 658. *See United States v. Garth*, 773 F.2d 1469, 1476 (5th Cir.1985), *cert. denied*, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 693 (1986). Defendants argue that the element of intent to defraud was not supported by substantial evidence. Specifically, defendants argue that the evidence demonstrated that Edgmon believed he had the authority to sell the cattle and, therefore, neither defendant had an intent to defraud. Defendants argue this failure of proof on the conversion charge also invalidates their convictions for conspiracy to convert.

■ After reviewing the record on appeal, we find that substantial evidence exists from which a reasonable jury could conclude that Edgmon acted with intent to defraud. The nature of the sales themselves support the jury findings. The sales of the FmHA collateral were made by Edgmon's father, Edgmon, Sr. The sales were made in the name of Edgmon, Sr., and the payment checks were payable to Edgmon, Sr., alone. The sales were structured in this manner even though the cattle sold were owned by Edgmon and not by Edgmon, Sr.

■ Further, at trial, defendant Edgmon testified that he knew that any check for the sale of FmHA collateral had to be issued in his name and FmHA's name. Supp.App. at 141. Edgmon testified he had made sales in the past and so knew that FmHA's name had to be on the check but, nonetheless, sold his cattle under his father's name and received payment in his father's name. *See id.* Thus, Edgmon's own testimony is sufficient to support a reasonable inference that, at the very least, Edgmon knew the form of the cattle sales

was improper yet proceeded with them anyway.

Additionally, on June 23, 1989, Edgmon met with an FmHA representative to fill out an FmHA loan related form for an additional FmHA loan. On that day, Edgmon represented that he had 450 head of cattle to use as collateral for a new loan. App. at 181. Edgmon made no mention that he had already sold some of the cattle he had used for collateral for his previous FmHA loans. To process Edgmon's new loan application, FmHA had to conduct a collateral inspection. Such an inspection was scheduled for August 8, 1989. Trans. Vol. I, at 52–54. Edgmon met with the FmHA representative but canceled the inspection and failed to inform FmHA that he had already sold much of the cattle he was offering as collateral. *Id.* Just before the second scheduled collateral inspection, Edgmon finally informed FmHA that he did not have the cattle he had claimed could serve as collateral because he had sold many of them. *Id.* at 56. From these facts, a reasonable jury could infer that Edgmon was attempting to conceal the ongoing sales of collateral from FmHA and actively misrepresenting the amount of cattle he had available to serve as collateral and further infer such actions indicated an intent to defraud. This, when taken with Edgmon's testimony that he knew the form of the cattle sales was improper, constitutes substantial evidence from which a reasonable jury could find that Edgmon acted with intent to deceive.

### 2. Money Laundering.

Defendant Edgmon, Sr., challenges the district court's refusal to enter a judgment of acquittal on the count of money laundering in violation of 18 U.S.C. § 1956 based on insufficiency of the evidence. One of the elements the government must prove beyond a reasonable doubt to convict under § 1956 money laundering is that the accused acted with intent to conceal or disguise the nature or source of proceeds of an illegal activity such as conversion of FmHA collateral. 18 U.S.C. § 1956(a)(1)(B)(i). Defendant Edgmon, Sr., argues that the jury finding that he acted

with intent to conceal the source of the funds is not supported by substantial evidence.

In asserting his position, Edgmon, Sr., relies on the case of *United States v. Sanders*, 929 F.2d 1466, 1470–73 (10th Cir. 1991). The *Sanders* case involved the proceeds of drug transactions. The drug dealers purchased automobiles with the proceeds of those drug transactions and were later convicted of money laundering based on the automobile purchases. In the *Sanders* opinion we interpreted § 1956. We held that merely spending the proceeds of illegal activities does not violate the money laundering statute. *Id.* at 1472. We noted that,

> the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities.

*Id.* In holding that the defendants in *Sanders* did not violate § 1956, we emphasized that no third parties were involved and no effort was made to conceal the identity of the defendants as the purchasers. *Id.*

■ The facts now before us are significantly different from those presented in *Sanders* and, unlike the *Sanders* facts, support a finding of a violation of the money laundering statute. In this case, a third party was used for the transaction. Defendant Gary Edgmon owned the cattle in his own name. The cattle served as collateral for a loan to Gary Edgmon in Gary Edgmon's name. The sales, however, were made by his father, Edgmon, Sr., in Edgmon, Sr.'s name. Payment for the cattle was made to Edgmon, Sr., not the true owner of the cattle, Gary Edgmon. After receiving the proceeds of the conversions in his name, Edgmon, Sr., used a substantial portion of the proceeds to purchase a 144 acre tract of land and a new tractor. Supp. App. at 49, 52–53. Edgmon, Sr., then used all of his equity in the land and the tractor to obtain a loan from a local bank. App. at

176, 179. The net effect was to take the proceeds of the conversion, pass them through a seller and a bank, and wind up with a check for an amount essentially equivalent to the original proceeds of the conversions. Edgmon, Sr., then paid a large portion of the proceeds to his son, Edgmon, the true owner of the sold cattle. These involved transactions, unlike the simple automobile purchases in *Sanders*, certainly support a finding under the money laundering statute of intent to conceal the origin or nature of the proceeds of unlawful activity.

## B. Motion For A New Trial.

■ Defendants next argue that the district court committed error by refusing to grant their motions for a new trial. On appeal, we review a district court's denial of a motion for a new trial for an abuse of discretion. *United States v. McIntyre*, 836 F.2d 467, 472 (10th Cir.1987). In contending that the district court abused its discretion, defendants merely reassert the arguments they made under their challenge to the refusal to enter judgment of acquittal. For the reasons discussed in the preceding section, therefore, we also reject defendants' challenge to the district court's failure to grant a new trial.

## C. FmHA's Failure To Follow FmHA Regulations.

■ Next, defendants challenge their convictions on what is presumably some form of a denial of due process argument. Defendants assert that FmHA failed to follow its own regulations in referring their case to the United States Attorney's Office for criminal prosecution. From this allegation, defendants make the leap of logic that FmHA's departure from its regulations raises a defense for them to the criminal prosecution by the United States Attorney's Office. Defendants cite no authority in support of this position.[1]

Under the facts and argument presented to us by counsel, we find no violation of due process. The regulations cited by defendants contemplate an orderly procedure for a local FmHA commissioner to refer a matter to the United States Attorney's Office for criminal investigation and possible prosecution. The regulations state that when a commissioner discovers an unauthorized sale of FmHA collateral, corrective action must be taken. 7 C.F.R. § 1962.-18(a). The regulations then direct that the commissioner notify the borrower of the unauthorized sale and demand restitution of the proceeds from the borrower. 7 C.F.R. § 1962.18(b). The notice should also inform the borrower that if restitution is

1. In the absence of any useful authority provided by the parties, we have attempted to identify other published cases in which defendants' theory has been presented to a court. We find four published opinions in which the deciding court was faced with an argument essentially the same as that offered by defendants. The argument did not prevail in any of the four cases. *See United States v. Fields*, 592 F.2d 638, 644–46 (2nd Cir.1978) (rejecting claim that informal criminal reference procedure of Securities and Exchange Commission violated due process and statutes and should invalidate convictions); *United States v. Hirt*, 465 F.2d 177, 178–79 (9th Cir.1972) (rejecting argument that criminal reference by local draft board violated regulations and thus due process thereby invalidating convictions); *United States v. Archer*, 455 F.2d 193, 195 (10th Cir.1972), *cert. denied* 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972) (rejecting claim that conviction should be overturned because local draft board referred case for criminal prosecution prematurely in violation of regulations and thereby denied due process); *United States v. Bloom*, 450 F.Supp. 323, 328–29 (E.D.Pa.1978) (rejecting claim that Securities and Exchange Commission violated defendant's due process rights by informally referring case for criminal prosecution). We do not presume to represent that these four opinions are the only published cases ruling on defendants' theory. The research of a dispassionate decision-maker, no matter how conscientious, can never replace the dedicated research efforts of a zealous advocate.

These four cases do not decide for us, unfortunately, the issue now presented. Three of the cases are distinguishable on significant points and so offer little guidance. *See Fields*, 592 F.2d at 644–46; *Hirt*, 465 F.2d at 178–79; *Bloom*, 450 F.Supp. at 328–29. While the fourth appears to be directly on point, this court dismissed the due process argument out of hand without discussion or meaningful analysis. *See Archer*, 455 F.2d at 195 ("This argument is without merit"). These cases serve only to indicate a less than enthusiastic judicial attitude toward the novel theory propounded by defendants and the need for thorough argument and research to support such a novel theory.

not made, the matter will be referred for criminal prosecution. *See* Guide Letter 1962–A–5. The commissioner in this case sent just such a notice. App. at 182(a). While the commissioner may or may not have fully complied with FmHA regulations regarding post disposition approval of the unauthorized sale, the reference of the case to the United States Attorney's Office followed an orderly pattern. We find no violation of due process based on the arguments made by defendants. *Cf. United States v. Garth*, 773 F.2d 1469, 1473–74 (5th Cir.1985) (finding that FmHA regulations regarding procedures for civil remedy for conversion violate due process offers no defense to prosecution for criminal conversion).

### D. Grand Jury Evidence.

■ Defendants also challenge their convictions on the grounds that the government failed to present substantial exculpatory evidence to the grand jury as required by *United States v. Williams*, 899 F.2d 898 (10th Cir.1990). Defendants assert that a government witness presented testimony to the grand jury that was misleading and inaccurate with respect to a crucial element of the crimes alleged. Defendants argue this misleading testimony undermines the reliability of the grand jury indictment and, therefore, entitles them to have their convictions based on that indictment set aside.

We are not persuaded by defendants' argument. In their analysis, defendants fail to account for *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). In *Mechanik*, the Supreme Court was faced with a factual situation analogous to that now presented to this court. The prosecution had violated Federal Rule of Criminal Procedure 6(d) by having two law enforcement agents testify in tandem. The grand jury issued an indictment following this improper procedure and, after a trial, a petit jury convicted the defendants of the crimes charged in the indictment. After the jury verdict, the defendants challenged their convictions on the basis of the error in the grand jury process. The Court found that the petit jury's verdict of guilt beyond a reasonable

doubt rendered the procedural error in the grand jury charging process harmless. *Id.* at 73, 106 S.Ct. at 943. In reaching its decision, the Court understood that the grand jury's role is merely to determine whether probable cause exists and not to determine guilt. The court noted, "We believe that the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted. Therefore, the convictions must stand despite the rule violation." *Id.* at 67, 106 S.Ct. at 940.

Though the alleged error in the grand jury proceedings in this case was arguably more significant than that committed in *Mechanik*, we find the reasoning of the Supreme Court applicable. The petit jury reviewed the same allegedly misleading evidence and defendants' "substantial exculpatory evidence" and found defendants guilty beyond a reasonable doubt. That finding of guilt beyond a reasonable doubt after having heard the evidence defendants allege should also have been presented to the grand jury "means ... that there was probable cause to believe that the defendants were guilty as charged." *See id.* at 70, 106 S.Ct. at 941.

### E. Double Jeopardy And Money Laundering.

■ Finally, defendant Edgmon, Sr., challenges his conviction for money laundering on the grounds that the conviction violates the Double Jeopardy Clause. Edgmon, Sr., contends that his conviction for both conversion and money laundering constitutes multiple punishments for the same offense. Edgmon, Sr., argues that the applicable double jeopardy test is the different fact test enumerated in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). Under the *Blockburger* test the inquiry is whether each statutory provision defining the crimes requires proof of a fact that the other does not. *Id.* The government does not dispute defendants' contention that, under this test, the crime of conversion does not require proof of a fact that money

laundering does not because the crime of conversion is an element of money laundering.[2] We, therefore, assume that defendant Edgmon, Sr., is correct in his assertion that conversion and money laundering "fail" the *Blockburger* test.

■ We do not find, however, that the *Blockburger* test is decisive of defendant's challenge. In a more recent opinion from the Supreme Court, *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), the Court further explained the analysis under a Double Jeopardy Clause challenge and the role of *Blockburger* in that analysis. In *Garrett*, the Court elaborated that a double jeopardy challenge requires a two-step analysis. *Id.* at 779, 786, 105 S.Ct. at 2411, 2415. In the first step, the court must determine whether the Congress intended each statutory violation to be a separate offense and whether one violation was intended to be a lesser included offense of the other. *Id.* at 779, 784, 105 S.Ct. at 2411, 2414. The *Blockburger* test is an aspect of this first step and is designed to help determine legislative intent. *Id.* at 779, 105 S.Ct. at 2411. If Congress did not intend the statutory violations to be separately punishable offenses, the analysis ends. If the Congress intended the statutory violations to be separate punishable offenses, the court must move to the second step of the analysis. *Id.* at 786, 105 S.Ct. at 2415. In the second step, the court must determine whether separate prosecutions or punishments for the offenses violates the Due Process Clause. *Id.*

### 1. Legislative Intent.

The Court in *Garrett* applied the two-step analysis to a challenge to prosecutions for a continuing criminal enterprise under 21 U.S.C. § 848 and one of the underlying predicate offenses. As in the present case, the two offenses "failed" the *Blockburger* test because one served as an element of the other. *See id.* at 779, 105 S.Ct. at 2411. The Court, however, noted that *Blockburger* is not decisive and is only one method of determining legislative intent. *See id.* at 778–79, 105 S.Ct. at 2411. The true test is whether the legislature intended the violations of the two different statutory provisions to be separately prosecutable offenses. *See id.* The Court determined that the legislative history and statutory framework of the continuing criminal enterprise statute clearly indicated that Congress intended it to be a separate and supplemental offense, in addition to, rather than instead of, the predicate offense. *Id.* at 784–86, 105 S.Ct. at 2414–15.

Like the continuing criminal enterprise statute reviewed in *Garrett*, Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered. The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity. The Senate report on the money laundering bill makes plain that the bill was intended to create a "new Federal offense against money laundering." Sen.R. 99–433 at 4. The discussion throughout the report is of the gap in the criminal law with respect to the post-crime hiding of the illgotten gains. *See id.* at 1–9. The Senate report and the statute itself

---

**2.** The money laundering statute provides in pertinent part:

Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity—

  (A)(i) with the intent to promote the carrying on of *specified unlawful activity;*

    .   .   .   .   .

  (B) ... knowing that the transaction is designed in whole or in part—

  (i) to conceal or disguise the nature, the location, the source, the ownership, or the

control of the proceeds of *specified unlawful activity;*

    .   .   .   .   .

shall be sentenced to a fine ... or imprisonment ... or both.

    .   .   .   .   .

(7) the term *"specified unlawful activity"* means—

    .   .   .   .   .

  (D) an offense under ..., *section 658 (relating to property mortgaged or pledged to farm credit agencies) [conversion].*

18 U.S.C. § 1956 (emphasis added).

indicate that the Congress intended simply to add a new criminal offense to punish activity that was not previously punished criminally. Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity." Congress enacted the money laundering statute to provide a punishment in addition to other punishment rather than instead of other punishment. We find that Congress intended money laundering and the "specified unlawful activity" to be separate offenses separately punishable.

## 2. *Double Jeopardy Clause.*

Having determined that Congress intended money laundering to be a separate offense from the "specified illegal activity" that is its predicate offense, and that it intended to permit prosecutions for both offenses, we must now determine whether prosecution for both offenses violates the Double Jeopardy Clause. The Double Jeopardy Clause states, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "The critical inquiry is whether [the broader offense] is considered the 'same offense' as one or more of its predicate offenses within the meaning of the Double Jeopardy Clause." *Garrett,* 471 U.S. at 786, 105 S.Ct. at 2415. In pursuing this inquiry, the *Garrett* court looked to the general meaning of the term "same" and to the allegations of the actual crimes charged and asked if they were the "same offense." *Id.*

Edgmon, Sr., was charged with conversion and money laundering. In the conversion charge, Edgmon, Sr., was alleged to have assisted his son in selling cattle that served as collateral for an FmHA loan with the intent to defraud. The mere assistance with the sale of the cattle, if accompanied by the intent to defraud, was a sufficient actus reus for conversion in the context of this case. The money laundering charge alleged that Edgmon, Sr., helped disguise the origin of the proceeds of those sales by receiving the money in his name rather than the son's, putting the proceeds in his own account, using the proceeds to obtain assets, then using those assets to obtain a new loan and once again hold the proceeds of the sales in an easily negotiable form. While some of the evidence presented on the two offenses may overlap, the actual conduct and the nature of the conduct constituting the two offenses are not the "same." One is simply a sale of cattle. The other is a line of financial transactions that result in the parties holding essentially the same amount of cash in the form of a check at the end of the transactions as they held at the beginning of the transactions. To convict of money laundering, the jury had to find that Edgmon, Sr., not only assisted in the conversion of FmHA collateral but that he then attempted to take the proceeds of that conversion and enter financial transactions designed to conceal the origin of those proceeds.

We find that the offenses of conversion and money laundering are analogous to the offense of a continuing criminal enterprise and its predicate offense considered by the Supreme Court in *Garrett.* Therefore, prosecution and punishment for both money laundering and conversion does not violate the Double Jeopardy Clause.

### III.

Having examined the arguments propounded by defendants, we find no reason to overturn their convictions. We have reviewed the record and find that substantial evidence exists from which a reasonable jury could conclude that defendants possessed the requisite mens rea for conversion of FmHA collateral. Substantial evidence also existed to support a finding that defendant Edgmon, Sr., had the mens rea necessary to be guilty of money laundering. We do not find that the purported violation by FmHA of its regulations should act to bar defendants' prosecution or invalidate their convictions. Furthermore, the finding by the petit jury of guilty beyond a reasonable doubt cured the alleged evidentiary errors that may have been committed in the grand jury charging process. Finally, we find that prosecution

of both money laundering and its predicate offense, conversion of FmHA collateral, does not violate the Double Jeopardy Clause.

AFFIRMED.