*529 Justice Breyer,
dissenting.
I join Justice Alito’s dissent while adding the following observations about what has been referred to as the “‘merger problem.’” Ante, at 515 (plurality opinion). Like the plurality, I doubt that Congress intended the money laundering statute automatically to cover financial transactions that constitute an essential part of a different underlying crime. Operating an illegal gambling business, for example, inevitably involves investment in overhead as well as payments to employees and winning customers; a drug offense normally involves payment for drugs; and bank robbery may well require the distribution of stolen cash to confederates. If the money laundering statute applies to this kind of transaction (i. e., if the transaction is automatically a “financial transaction” that “involves the proceeds of specified unlawful activity” made “with the intent to promote the carrying on of specified unlawful activity”), then the Government can seek a heavier money laundering penalty (say, 20 years), even though the only conduct at issue is conduct that warranted a lighter penalty (say, 5 years for illegal gambling). 18 U. S. C. § 1956(a)(1).
It is difficult to understand why Congress would have intended the Government to possess this punishment-transforming power. Perhaps for this reason, the Tenth Circuit has written that “Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior ‘specified unlawful activity.’” United States v. Edgmon, 952 F. 2d 1206, 1214 (1991). And, in 1997, the United States Sentencing Commission told Congress that it agreed with the Department of Justice that “money laundering cannot properly be charged for ‘merged’ transactions that are part of the underlying crime.” Report to Congress: *530 Sentencing Policy for Money Laundering Offenses, including Comments on Dept. of Justice Report, p. 16 (Sept. 1997), online at http://www.ussc.gov/r_congress/launder.pdf (as visited May 20, 2008, and available in Clerk of Court’s case file).
Thus, like the plurality, I see a “merger” problem. But, unlike the plurality, I do not believe that we should look to the word “proceeds” for a solution. For one thing, the plurality’s interpretation of that word creates the serious logical and practical difficulties that Justice Alito describes. See post, at 537-542 (dissenting opinion) (describing difficulties associated with proof and accounting). For another thing, there are other, more legally felicitous places to look for a solution. The Tenth Circuit, for example, has simply held that the money laundering offense and the underlying offense that generated the money to be laundered must be distinct in order to be separately punishable. Edgmon, supra, at 1214. Alternatively the money laundering statute’s phrase “with the intent to promote the carrying on of specified unlawful activity” may not apply where, for example, only one instance of that underlying activity is at issue. (The Seventh Circuit on a prior appeal in this case rejected that argument, and thus we do not consider it here. See United States v. Febus, 218 F. 3d 784, 789 (2000).)
Finally, if the “merger” problem is essentially a problem of fairness in sentencing, the Sentencing Commission has adequate authority to address it. Congress has instructed the Commission to “avoi[d] unwarranted sentencing disparities” among those “found guilty of similar criminal conduct. ” 28 U. S. C. § 991(b)(1)(B) (emphasis added); see also § 994(f) (instructing the Commission to pay particular attention to those disparities). The current money laundering Guideline, United States Sentencing Commission, Guidelines Manual §2S1.1 (Nov. 2007), by making no exception for a situation where nothing but a single instance of the underlying crime has taken place, would seem to create a serious and unwarranted disparity among defendants who have engaged in *531 identical conduct. My hope is that the Commission’s past efforts to tie more closely the offense level for money laundering to the offense level of the underlying crime, see id., Supp. to App. C, Arndt. 634 (Nov. 2001), suggest a willingness to consider directly this kind of disparity. Such an approach could solve the “merger” problem without resort to creating complex interpretations of the statute’s language. And any such solution could be applied retroactively. See 28 U. S. C. § 994(u).
In light of these alternative possibilities, I dissent.
Justice Alito, with whom The Chief Justice, Justice Kennedy, and Justice Breyer join, dissenting.
Fairly read, the term “proceeds,” as used in the principal federal money laundering statute, 18 U. S. C. § 1956(a), means “the total amount brought in,” the primary dictionary definition. Webster’s Third New International Dictionary 1807 (1976) (hereinafter Webster’s 3d). See also Random House Dictionary of the English Language 1542 (2d ed. 1987) (“the total amount derived from a sale or other transaction”). The plurality opinion, however, makes no serious effort to interpret this important statutory term. Ignoring the context in which the term is used, the problems that the money laundering statute was enacted to address, and the obvious practical considerations that those responsible for drafting the statute almost certainly had in mind, that opinion is quick to pronounce the term hopelessly ambiguous and thus to invoke the rule of lenity. Concluding that “proceeds” means “profits,” the plurality opinion’s interpretation would frustrate Congress’ intent and maim a statute that was enacted as an important defense against organized criminal enterprises.
Fortunately, Justice Stevens’ opinion recognizes that the .term “proceeds” “include[s] gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales.” Ante, at 526 (opinion concur *532 ring in judgment).[1] I cannot agree with Justice Stevens’ approach insofar as it holds that the meaning of the term “proceeds” varies depending on the nature of the illegal activity that produces the laundered funds, but at least that approach preserves the correct interpretation of the statute in most of the cases that were the focus of congressional concern when the money laundering statute was enacted.
I
A
While the primary definition of the term “proceeds” is “the total amount brought in,” I recognize that the term may also be used to mean “net profit,” Webster’s 3d 1807, and I do not suggest that the question presented in this case can be answered simply by opening a dictionary. When a word has more than one meaning, the meaning that is intended is often made clear by the context in which the word is used, and thus in this case, upon finding that the term “proceeds” may mean both “the total amount brought in” and “net profit,” the appropriate next step is not to abandon any effort at interpretation and summon in the rule of lenity. Rather, the next thing to do is to ask what the term “proceeds” customarily means in the context that is relevant here — a money laundering statute.
The federal money laundering statute is not the only money laundering provision that uses the term “proceeds.” On the contrary, the term is a staple of money laundering laws, and it is instructive that in every single one of these provisions in which the term “proceeds” is defined — and there are many — the law specifies that “proceeds” means “the total amount brought in.”
*533 The leading treaty on international money laundering, the United Nations Convention Against Transnational Organized Crime (Convention), Nov. 15, 2000, 2225 U. N. T. S. 209 (Treaty No. 1-39574), which has been adopted by the United States and 146 other countries,[2] is instructive. This treaty contains a provision that is very similar to § 1956(a)(l)(B)(i). Article 6.1 of the Convention obligates signatory nations to criminalize “[t]he ... transfer of property, knowing that such property is the proceeds of crime, for the purpose of concealing or disguising the illicit origin of the property or of helping any person who is involved in the commission of the predicate offence to evade the legal consequences of his or her action.” Id., at 277 (emphasis added). The Convention defines the term “proceeds” to mean “any property derived from or obtained, directly or indirectly, through the commission of an offence.” Id., at 275 (Art. 2(e)). The money laundering provision of the Convention thus covers gross receipts.[3] The term “proceeds” is given a similarly broad scope in the Model Money Laundering Act (Model Act). See President’s Commission on Model State Drug Laws, Economic Remedies § C (1993). Section 5(a)(1) of the Model Act criminalizes transactions involving property that is “the proceeds of some form of unlawful activity,” and the Model Act defines “proceeds” as “property acquired or derived directly *534 or indirectly from, produced through, realized through, or caused by an act or omission ... including] any property of. any kind,” §4(a).
Fourteen States have money laundering statutes that define the term “proceeds,” and in every one of these laws the term is defined in a way that encompasses gross receipts. See Ariz. Rev. Stat. Ann. §§ 13-2314(N)(3) (West 2001), 13-2317(F)(4)(b) (West Supp. 2007); Ark. Code Ann. §5-42-203(5) (2006); Cal. Health & Safety Code Ann. § 11370.9(h)(1) (West 2007); Haw. Rev. Stat. §§708A-2, 708A-3 (2006 Supp.); Ind. Code §§35-45-15-4, 35-45-15-5 (West 2004); Iowa Code §§706B.1(1), 706B.2 (2005); La. Stat. Ann. § 14:230(A)(4) (West 2004); Mich. Comp. Laws Ann. §§ 750.41lj(f), 750.411k (West 2004); N. M. Stat. Ann. §§30-51-2(E), 30-51-4(A) (2004); Ohio Rev. Code Ann. §§ 1315.51(H), 1315.55 (Lexis 2006) ; Tex. Penal Code Ann. §§34.01(4), 34.02 (West Supp. 2007) ; Utah Code Ann. §§76-10-1902(9), 76-10-1903 (Lexis 2007); Va. Code Ann. §§ 18.2-246.2, 18.2-246.3 (Lexis 2004); Wash. Rev. Code §§ 9A.83.010(5), 9A.83.020 (2006). Cf. N. J. Stat. Ann. §2C:21-25(d) (West 2005).[4]
This pattern of usage is revealing. It strongly suggests that when lawmakers, knowledgeable about the nature and problem of money laundering, use the term “proceeds” in a *535 money laundering provision, they customarily mean for the term to reach all receipts and not just profits.[5]
B
There is a very good reason for this uniform pattern of usage. Money laundering provisions serve two chief ends. First, they provide deterrence by preventing drug traffickers and other criminals who amass large quantities of cash from using these funds “to support a luxurious lifestyle” or otherwise to enjoy the fruits of their crimes. Model Act, Policy Statement, at C-105. See President’s Commission on Organized Crime, Interim Report to President and Attorney General, The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering 7-8 (Oct. 1984) (hereinafter Interim Report); Aranson, Bouker, & Hannan, Money Laundering, 31 Am. Crim. L. Rev. 721, 722 (1994); H. R. Rep. No. 99-746, p. 16 (1986) (hereinafter H. R. Rep.). Second, they inhibit the growth of criminal enterprises by preventing *536 the use of dirty money to promote the enterprise’s growth. See, e.g., 18 U. S. C. §§ 1956(a)(l)(A)(i), (a)(2)(A), and (a)(3)(A); Model Act §§ 5(a)(2), (4); N. J. Stat. Ann. §2C:21-25(b)(1); Tex. Penal Code Ann. §§34.02(a)(3)-(4).
Both of these objectives are frustrated if a money laundering statute is limited to profits. Dirty money may be used to support “a luxurious lifestyle” and to grow an illegal enterprise whenever the enterprise possesses large amounts of illegally obtained cash. And illegal enterprises may acquire such cash while engaging in unlawful activity that is unprofitable.
Suppose, for example, that a drug cartel sends a large shipment of drugs to this country, a good part of the shipment is intercepted, the remainder is sold, the cartel ends up with a net loss but with a large quantity of cash on its hands, and the cartel uses the cash in financial transactions that are designed to conceal the source of the cash or to promote further crime. There is no plausible reason why Congress would not have wanted the money laundering statute to apply to these financial transactions. If the cartel leaders use the money to live in luxury, this provides an incentive for these individuals to stay in the business and for others to enter. If the cartel uses the money to finance future drug shipments or to expand the business, public safety is harmed.
It is certainly true that Congress, in enacting the federal money laundering statute, was primarily concerned about criminal enterprises that realize profits. A criminal operation that consistently loses money will not last very long and thus presents a lesser danger than a profitable operation. But narrowing a money laundering statute so that it reaches only profits produces two perverse results that Congress cannot have wanted. First, it immunizes successful criminal enterprises during those periods when they are operating temporarily in the red. Second, and more important, it introduces pointless and difficult problems of proof. Because *537 the dangers presented by money laundering are present whenever criminals have large stores of illegally derived funds on their hands, there is little reason to require proof— which may be harder to assemble than the plurality opinion acknowledges — that the funds represent profits.
C
The implausibility of a net income interpretation is highlighted in cases involving professionals and others who are hired to launder money. Those who are knowledgeable about money laundering stress the importance of prosecuting these hired money launderers. See, e. g., Depts. of Treasury and Justice, The 2001 National Money Laundering Strategy, pp. ix-x, 1-2 (Sept. 2001), online at http://www.treas.gov/press/releases/docs/ml2001.pdf; Financial Action Task Force on Money Laundering, 1996-1997 Report on Money Laundering Typologies 7 (Feb. 1997), online at http://www.fatf-gafi.org/dataoecd/31/29/34043795.pdf; Butterworths International Guide to Money Laundering Law and Practice 629 (T. Graham 2d ed. 2003); Ratliff, Third-Party Money Laundering: Problems of Proof and Prosecutorial Discretion, 7 Stan. L. & Pol’y Rev. 173 (1996); Sultzer, Money Laundering: The Scope of the Problem and Attempts to Combat It, 63 Tenn. L. Rev. 143, 147-148 (1995); H. R. Rep., at 16-17.
A net income interpretation would risk hamstringing such prosecutions. To violate 18 U. S. C. § 1956(a)(1), a defendant must “kno[w] that the property involved in a financial transaction represents the proceeds of some form of unlawful activity.” A professional money launderer is not likely to know (or perhaps even to care) whether the enterprise is operating in the black when the funds in question were acquired. Therefore, under a net income interpretation, financial specialists and others who are hired to launder funds would generally be beyond the reach of the statute, something that Congress almost certainly did not intend.
*538 It is revealing that the money laundering statute explicitly provides that a money launderer need only know that “the property involved in the transaction represented proceeds from some form, though not necessarily which form, of [specified illegal] activity.” § 1956(c)(1). Thus, the prosecution is not required to prove that a hired money launderer knew that funds provided for laundering derived from, say, drug sales as opposed to gambling. There is no reason to think that hired money launderers are more likely to know whether funds include profits than they are to know the nature of the illegal activity from which the funds were derived. Consequently, § 1956(c) suggests that Congress did not intend to require proof that a hired money launderer knew that funds provided for laundering included profits.
The plurality opinion dismisses these concerns with the observation that a jury may infer that a hired launderer knew that funds included profits if the launderer had a long-running relationship with the entity or person providing the funds or knew that the entity or person had been involved in the illegal enterprise for a lengthy period. See ante, at 521. But what about the case where the launderer accepts a million dollars of drug money on a single occasion? And even if there would be legally sufficient evidence to support an inference of the requisite knowledge under the circumstances that the plurality opinion posits, the requirement of convincing a jury to find beyond a reasonable doubt that the funds included profits would pose a troublesome and (in light of the aim of the money laundering statute) pointless obstacle.
D
Even in cases in which the defendants are alleged to have been involved in the underlying criminal activity, a net income interpretation would produce nettlesome problems that Congress cannot have wanted. These problems may be especially acute in the very cases that money laundering statutes principally target, that is, cases involving large-scale *539 criminal operations that continue over a substantial period of time, particularly drug cartels and other organized crime syndicates.
The federal money laundering statute was enacted in the wake of an influential report by the President’s Commission on Organized Crime that focused squarely on criminal enterprises of this type. See Interim Report 7-8 (described in S. Rep. No. 99-433, pp. 2-4 (1986) (hereinafter S. Rep.) and H. R. Rep., at 16). The Commission identified drug traffickers and other organized criminal groups as presenting the most serious problems. See Interim Report 7. The Commission found that “narcotics traffickers, who must conceal billions of dollars in cash from detection by the government, create by far the greatest demand for money laundering schemes” but that “numerous other types of activities typical of organized crime, such as loansharking and gambling, also create an appreciable demand for such schemes.” Ibid. To illustrate the scope and nature of the money laundering problem, a section of the Interim Report was devoted to case studies, most of which involved the laundering of drug money. Id., at 29-49.
As a prime example of the problem of money laundering, the report discussed the so-called “Pizza Connection” case that was prosecuted in federal court in New York City in the 1980’s. In that case, the evidence showed that the Sicilian Mafia and organized crime elements in the United States, over a period of many years, imported huge amounts of heroin into this country, sold the heroin here, accumulated millions of dollars of cash, and then laundered the funds by smuggling them overseas in suitcases or funneling the money through a maze of bank accounts. See id., at 31-35; United States v. Casamento, 887 F. 2d 1141, 1148-1149 (CA2 1989).
Following the issuance of the Interim Report, Congress turned its attention to the problem of money laundering, and much of the discussion focused on the need to prevent laundering by drug and organized crime syndicates. See, e. g., *540 S. Rep., at 3 (discussing “organized crime ‘businesses’ such as gambling, prostitution, and loansharking”), 4 (“Money laundering is a crucial financial underpinning of organized crime and narcotics trafficking” (internal quotation marks omitted)); Hearing on Money Laundering Legislation before the Senate Committee on the Judiciary, 99th Cong., 1st Sess., 1 (1985) (statement of Chairman Thurmond), 29 (statement of Sen. Biden), 30 (statement of Sen. DeConcini), 31 (statement of Sen. D’Amato), 53 (statement of Assistant Attorney General Trott).
In light of these concerns, it is most unlikely that Congress meant to enact a money laundering statute that would present daunting obstacles in the very sort of cases that had been identified as presenting the most pressing problems, that is, cases, like the “Pizza Connection” case, in which law enforcement intercepts cash or wire transfers of funds derived from drug sales or other unlawful activity that occurred over a period of time. The plurality opinion’s interpretation of the term “proceeds,” however, would often produce such problems. Tracing funds back to particular drug sales and proving that these sales were profitable will often prove impossible. See United States v. Bajakajian, 524 U. S. 321, 351-352 (1998) (Kennedy, J., dissenting). Indeed, it will often be hard even to establish with any precision the period of time during which the drug sales occurred. But assuming that the Government can prove roughly when the funds were acquired, the next hurdle would be to show that the drug ring had net income during the time when the funds were acquired.
“Net income” means “[t]he excess of revenues over all related expenses for a given period.” R. Estes, Dictionary of Accounting 88 (1981) (emphasis deleted). There are no generally accepted accounting principles for determining the net income of illegal enterprises, and therefore, in order to apply a net income interpretation, special accounting rules would have to be developed.
*541 In the drug-money cases that I have been discussing, the courts would have to decide whether the drug syndicate’s net income should be calculated on an annual, quarterly, or some other basis. In addition, the courts would be forced to devise rules for determining the scope of the enterprise for which the net income calculation must be performed. Suppose, for example, that there were connections of an uncertain nature or degree between drug operations in different cities or countries. Rules would be needed to determine whether affiliated criminal groups should be regarded as one enterprise or several. And proof regarding the connections between such operations would often be very difficult to obtain. Criminal enterprises do not have papers of incorporation, partnership agreements, or (in most instances) other documents establishing precise business relationships.
Rules would also be needed in order to determine whether particular illegal expenditures should be considered as expenses. In the “Pizza Connection” case, the Sicilian Mafia used its income for such things as the murder of magistrates, police officers, witnesses, and rivals. See, e. g., Casamento, supra, at 1154-1156; United States v. Gambino, 809 F. Supp. 1061,1065-1068 (SDNY 1992). Are these expenditures simply a cost of engaging in the drug trade? Are they business expenses?
If a net income interpretation were taken to its logical conclusion, it presumably would be necessary as well to work out rules for the depreciation of instrumentalities of crime that must occasionally be replaced due to the efforts of law enforcement. But it seems quite implausible that Congress wanted courts or juries in money laundering cases to grapple with questions such as the useful life of, say, a drug processing plant or laboratory or the airplanes and boats that are used to smuggle drugs. And assuming that the accounting issues can ultimately be resolved by the courts, there would remain serious problems of proof. Illegal enterprises gener *542 ally do not keep books and records like legitimate businesses do.
It is tempting to dismiss many of the problems noted above on the ground that “everyone knows” that drug cartels, organized crime syndicates, and the like make a profit. But such groups may not operate in the black at all times, and in any event, if net income is an element of the money laundering offense, the prosecution must prove net income beyond a reasonable doubt. The prosecution cannot simply ask the jury to take notice of the fact that these groups are profitable.
My point in citing the accounting and proof problems that would be produced by a net income interpretation is not that the “‘receipts’” interpretation is preferable because “it is easier to prosecute,” ante, at 519 (plurality opinion), but that creating these obstacles would serve no discernible purpose. Even if a drug or gambling ring was temporarily operating in the red during a particular period, the laundering of money acquired during that time would present the same dangers as the laundering of money acquired during times of profit. It is therefore implausible that Congress wanted to throw up such pointless obstacles.
The plurality opinion attempts to minimize all these problems by stating that “to establish the proceeds element under the ‘profits’ interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction.” Ante, at 520. This suggestion ignores both the language of the money laundering statute, which makes no reference to an “instance” of unlawful activity, and the realities of money laundering prosecutions. The prototypical money laundering case is not a case in which a defendant engages in a single, discrete criminal act and then launders the money derived from that act — for example, a cáse in which a “felon . . . uses . . . stolen money to pay for the rented getaway car.” Ante, at 516. Rather, the proto *543 typical case involves mimerous criminal acts that occur over a period of time and the accumulation of funds from all these acts prior to laundering — for example, the organized crime syndicate or drug cartel that amasses large sums before engaging in a laundering transaction.
Take, for example, a case in which a defendant is charged with doing what was done in the “Pizza Connection” case— transferring millions of dollars of drug money overseas, knowing that the funds represent the proceeds of drug trafficking (“some form of unlawful activity”) and that the transfer was designed to conceal the origin of the funds. See 18 U. S. C. § 1956(a)(2)(B). In such a case, it is unrealistic to think that individual dollars can be traced back to individual drug sales — or that Congress wanted to require such tracing.
Although the plurality opinion begins by touting the “single instance” theory as a cure for the accounting and proof problems that a “profits” interpretation produces, the plurality’s application of the “single instance” theory to the case at hand shows that this theory will not work. In this case, the “unlawful activity” that produced the funds at issue in the substantive money laundering counts was the operation of the Santos lottery,[6] and it is hardly apparent what constitutes a “single instance” of running a gambling business. Did each lottery drawing represent a separate “instance”? Each wager? And how long does each gambling “instance” last? A day? A week? A month?
When the plurality opinion addresses these questions, it turns out that “a single instance” means all instances that are charged, i. e., it means that the Government had to show that receipts exceeded costs during the time the defendant allegedly conducted, financed, etc., the gambling operation. See ante, at 520-521, n. 7. Here, since the Indictment alleged that the Santos lottery continued for more than 6 years (“[beginning in or about January 1989 and continuing to in *544 or about December 1994, the exact dates being unknown to the Grand Jury”),[7] the plurality would apparently compel the Government to prove that the lottery was profitable over this entire period.
If this is where the “single instance” theory leads, the theory plainly does not solve the accounting and proof problems we have noted. And the plurality’s suggestion that the Government had to show that the gambling operation was profitable for this entire period leads to preposterous results. Suppose that the lottery was profitable for the first five years and, at the end of each year, respondents laundered funds derived from the business. Suppose that in the sixth year the business incurred heavy losses — losses so heavy that they wiped out all of the profits from the first five years. According to the plurality, if respondents were found to have operated the lottery during the entire 6-year period, then the financial transactions that occurred at the end of years one, two, three, four, and five would not violate the money laundering statute, even though an accounting done at those times would have come to the conclusion that the funds included profits. That result makes no sense.
Whenever a money laundering indictment charges that the laundered funds derived from- an “unlawful activity” that comprehends numerous acts that occurred over a considerable period of time — and that is precisely the situation in many of the types of cases that the money laundering statute principally targeted — the plurality opinion’s interpretation will produce difficulties. I have already discussed drug and gambling cases, and similar problems will arise in cases in which the unlawful activity is a form of fraud. For example, the unlawful activity in mail fraud (18 U. S. C. § 1341) is the scheme to defraud, not the individual mailings carried out in furtherance of the scheme. See Neder v. United States, 527 U. S. 1,19 (1999); United States v. Mankarious, 151 F. 3d 694 *545 (CA7 1998). In such a case, what will constitute the “single instance of unlawful activity”? Will each mailing be a separate “instance”? The same problem arises with other fraud predicates, including wire fraud (§ 1343), see, e. g., United States v. Zvi, 168 F. 3d 49 (CA2 1999), and financial institution fraud (§ 1344), see, e. g., United States v. Farr, 69 F. 3d 545, 1995 WL 638249 (CA9 1995) (unpublished).
The plurality opinion suggests that the application of a profits interpretation will be easy in cases in which the financial transactions are payments of “expenses.” Ante, at 516-517. But it may be no small matter to determine whether particular payments are for “expenses.” When the manager of a gambling operation distributes cash to those who work in the operation, the manager may be paying them the rough equivalent of a salary; that is, the recipients may expect to receive a certain amount for their services whether or not the operation is profitable. On the other hand, those who work in the operation may have the expectation of receiving a certain percentage of the gross revenue (perhaps even in addition to a salary), in which case their distribution may include profits. Such was the case in Santos’ lottery, where the runners were paid a percentage of gross revenue. See Indictment 5; 16 Tr. 1399 (Oct. 9, 1997).
The plurality opinion cites 18 U. S. C. § 1963(a) and 21 U. S. C. § 853(a) for the proposition that Congress has “elsewhere” imposed the burden of proving that illegally obtained funds represent profits, but the plurality opinion’s examples are inapposite. Ante, at 519-520. Neither of these provisions, however, requires a determination of net income. Both provisions permit a fine in the amount of “not more than twice the gross profits or other proceeds.” 18 U. S. C. § 1963(a). Thus, the term “proceeds” as used in these provisions is not limited to profits.[8]
*546 For all these reasons, I am convinced that the term “proceeds” in the money laundering statute means gross receipts, not net income. And contrary to the approach taken by Justice Stevens, I do not see how the meaning of the term “proceeds” can vary depending on the nature of the illegal activity that produced the laundered funds.
II
A
It is apparent that a chief reason for interpreting the term “proceeds” to mean net income in all money laundering cases (the approach taken in the plurality opinion) or in some money laundering cases (the approach taken by Justice Stevens) is the desire to avoid a “merger” problem in gambling cases — that is, to avoid an interpretation that would mean that every violation of §1955 (conducting an illegal gambling business) would also constitute a violation of the money laundering statute, which carries a much higher maximum penalty (20 as opposed to 5 years’ imprisonment). This concern is misplaced and provides no justification for hobbling a statute that applies to more than 250 predicate offenses and not just running an illegal gambling business.
*547 First, the so-called merger problem is fundamentally a sentencing problem, and the proper remedy is a sentencing remedy. While it is true that the money laundering statute has a higher maximum sentence than the gambling business statute, neither statute has a mandatory minimum. Thus, these statutes do not require a judge to increase a defendant’s sentence simply because the defendant was convicted of money laundering as well as running a gambling business. When the respondents were convicted, their money laundering convictions resulted in higher sentences only because of the money laundering Sentencing Guideline, United States Sentencing Commission, Guidelines Manual §2S1.1 (Nov. 1997) (USSG), which, in the pre-Booker[9] era, was mandatory. I agree with Justice Breyer, ante, at 530-531 (dissenting opinion), that if a defendant is convicted of money laundering for doing no more than is required for a violation of 18 U. S. C. § 1955, the defendant’s sentence should be no higher than it would have been if the defendant had violated only that latter provision. Insofar as the Guidelines previously required — and now advise in favor of — a stiffer sentence, the obvious remedy is an amendment of the money laundering Guideline. And of course, now that the Guidelines are no longer mandatory, a sentencing judge could impose the sentence called for by the Guideline that applies to the gambling business provision, see USSG § 2E3.1(a)(l) (Nov. 2007), or an entirely different sentence.
Second, the merger problem that the plurality opinion and Justice Stevens seek to avoid assumes the correctness of the interpretation of the promotion prong of the money laundering statute that the Seventh Circuit adopted in Santos’ direct appeal, i e., that a defendant “promotes” an illegal gambling business by doing those things, such as paying employees and winning bettors, that are needed merely to keep *548 the business running. As Santos’ brief puts it, the merger problem arises when the interpretation of “proceeds” as gross receipts is “[cjombined with the Government’s broad application of the ‘promotion’ prong of the money laundering statute.” Brief for Respondent Santos 6. But the meaning of the element of promotion is not before us in this case, and it would not make sense to allow our interpretation of “proceeds” to be dictated by an unreviewed interpretation of another statutory element.
Third, even if there is a merger problem, it occurs in only a subset of money laundering cases. The money laundering statute reaches financial transactions that are intended to promote more than 250 other crimes, ante, at 516 (plurality opinion), as well as transactions that are intended to conceal or disguise the nature, location, source, ownership, or control of illegally obtained funds. See 18 U. S. C. § 1956(a). The meaning of the term “proceeds” cannot vary from one money laundering case to the next, and the plurality opinion and Justice Stevens inappropriately allow the interpretation of that term to be controlled by a problem that may arise in only a subset of cases.
B
The plurality opinion defends its interpretation by invoking the rule of lenity, but the rule of lenity does not require us to put aside the usual tools of statutory interpretation or to adopt the narrowest possible dictionary definition of the terms in a criminal statute. On the contrary, “[b]ecause the meaning of language is inherently contextual, we have declined to deem a statute ‘ambiguous’ for purposes of lenity merely because it was possible to articulate a construction more narrow than that urged by the Government.” Moskal v. United States, 498 U. S. 103, 108 (1990) (citing McElroy v. United States, 455 U. S. 642, 657-658 (1982)). As I have explained above, the meaning of “proceeds” in the money laundering statute emerges with reasonable clarity when *549 the term is viewed in context, making the rule of lenity inapplicable.
* * *
For these reasons, I would reverse the decision of the Court of Appeals, and I therefore respectfully dissent.

 In light of the plurality opinion’s discussion of “the stare decisis effect of Justice Stevens’ opinion,” ante, at 523, it must be noted that five Justices agree with the position taken by Justice Stevens on the matter discussed in the preceding sentence of the text.

 See Multilateral Treaties Deposited With the Secretary-General, pt. I, ch. XVIII, No. 12, United Nations Convention Against Transnational Crime (Nov. 15, 2000), online at http://untreaty.un.org/ENGLISH/bible/ englishinternetbible/partI/chapterXVIII/treatyl3.asp (all Internet materials as visited May 29, 2008, and available in Clerk of Court’s case file).

 If 18 U. S. C. § 1956 were limited to profits, it would be narrower than the obligation that the United States undertook in Article 6.1 of the Convention, but the Department of State has taken the position that no new legislation is needed to bring the United States into compliance. See Hearing on Law Enforcement Treaties before the Senate Committee on Foreign Relations, 108th Cong., 2d Sess., 10 (2004) (statement of Samuel M. Witten, Deputy Legal Adviser) (“[W]e can comply with the Convention’s criminalization obligations without need for new legislation”).

 Connecticut, the only State with a money laundering statute that does not use the term “proceeds,” uses equivalent language that is not limited to profits. See Conn. Gen. Stat. § 53a-276 (2005) (“A person is guilty of money laundering in the first degree when he exchanges ... one or more monetary instruments derived from criminal conduct constituting a felony”). I have found no money laundering statute that defines “proceeds” to mean profits or that uses other language that limits the law’s reach to profits or net income.
The only state money laundering statute that even uses the term “profits,” “net income,” or something similar is that of Arkansas, which plainly defines “criminal proceeds” to include all gross receipts of criminal conduct: “‘Criminal proceeds’ means: (A) Anything of value furnished or intended to be furnished in exchange for criminal conduct or contraband received in violation of state or federal law; and (B) Property or profits traceable to” such an exchange. Ark. Code Ann. § 5-42-203(5).

 The version of the money laundering statute originally passed by the House reflected a similar legislative judgment. The bill made it a crime to engage in financial transactions and certain commercial transactions involving “criminally derived property that is derived from a designated offense.” H. R. 5484, 99th Cong., 2d Sess., § 602, p. 154 (1986) (as introduced). The term “criminally derived property” is naturally understood to include all property that is “receive[d]” or “obtain[ed]” as a result of criminal activity, see Webster’s 3d 608; Random House Dictionary of the English Language 389 (1967), and thus to include all gross receipts and not just profit. The House bill defined the term “criminally derived property” to mean “any property constituting, or derived from, proceeds obtained from a criminal offense.” H. R. 5484, §602, at 158 (emphasis added). Accordingly, the House seems to have understood “proceeds” to include gross receipts.
The bill passed by the Senate, like the current money laundering statute, simply used the term “proceeds,” S. 2683, 99th Cong., 2d Sess., § 2(a) (1986), and the House acceded to the Senate version. See H. R. 5484,99th Cong., 2d Sess., § 1352, p. 48 (1986) (as enacted). There is no suggestion in the legislative history that the term “criminally derived property” and the term “proceeds” were perceived as having different meanings.

 See Indictment in United States v. Almeda, No. 2:96 CR-044 RL (ND Ind., May 10,1996), pp. 3,14-15 (hereinafter Indictment).

 See id., at 3.

 In 18 U. S. C. § 981(a)(2)(B), which is a forfeiture provision of limited scope, Congress defines the term “proceeds” to mean net income. However, that definition applies only “[i]n cases involving lawful goods or law *546 ful services that are sold or provided in an illegal manner.” Calculating net income in that situation is easier than it would be in most money laundering cases, and it is noteworthy that Congress took care to provide rules and procedures to be used in making the calculation. See ibid. If Congress had intended to require proof of net income in money laundering eases, it is likely that Congress likewise would have specified the rules and procedures to be used. It is noteworthy that subparagraph (A) of § 981(a)(2), which the plurality opinion does not mention, provides that in cases that are more analogous to the typical money laundering case, i. e., “cases involving illegal goods [or] illegal services,” the term “proceeds” “means [any] property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.”

 United, States v. Booker, 543 U. S. 220 (2005).